EXHIBIT "A"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| FLEETWOOD SERVICES, LLC<br><br>Plaintiff,<br><br>v.<br><br>RAM CAPITAL FUNDING LLC, TSVI REICH a/k/a STEVE REICH, RICHMOND CAPITAL GROUP LLC n/k/a RCG ADVANCES LLC and ROBERT GIARDINA<br><br>Defendants | Index No.<br><br>**SUMMONS**<br><br>DATE FILED: March 18, 2020<br><br>Plaintiff designates New York County as the place of trial<br><br>The basis of venue is the Defendants place of business |

To:

Ram Capital Funding, LLC
111 John Street, Suite 1210,
New York, New York 10038

Richmond Capital Group, LLC
n/k/a RCG Advances
111 John Street, Suite 1210,
New York, New York 10038

Tsvi Reich a/k/a Steve Reich
1 W. End Avenue, Apt. 27F
New York, New York 10023

Robert Giardina
158 Portage Avenue
Staten Island, New York 10314.

**YOU ARE HEREBY SUMMONED** to appear in this action by serving a notice of appearance on the Plaintiffs' counsel at the address set forth below, and to do so within 20 days after the service of this summons, exclusive of the day of service (or within thirty (30) days if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear, judgment will be taken against you by default for the relief demanded below.

Dated: March 18, 2020
        New York, New York

WHITE AND WILLIAMS LLC

*[signature]*

Shane R. Heskin, Esq.
7 Times Square,
New York, New York 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiff Fleetwood Services LLC*

1

Case 1:20-cv-05120-LJL   Document 1-1   Filed 07/03/20   Page 3 of 27

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

FLEETWOOD SERVICES, LLC

                            Plaintiff,

v.

RAM CAPITAL FUNDING LLC, TSVI REICH
a/k/a STEVE REICH, RICHMOND CAPITAL
GROUP LLC n/k/a RCG ADVANCES LLC and
ROBERT GIARDINA

                            Defendants

Index No.:

**COMPLAINT**

Fleetwood Services, LLC ("Plaintiff" or "Fleetwood") as and for its first Compliant against Ram Capital Funding, LLC ("Ram"), Tsvi Reich ("Reich"), Richmond Capital Group LLC n/k/a RCG Advances ("Richmond") and Robert Giardina ("Giardina" and collectively, with Ram, Reich and Richmond, the "Defendants"), hereby alleges as follows:

**<u>NATURE OF THE CASE</u>**

1.      This a RICO action to recover damages caused to a small Texas business by reason of the Defendants' collection of a loan that charged interest in excess of 400% per annum which rate is more than ten times (10x) the rate permitted under the usury statutes of Texas and New York. To evade applicable usury statutes, the loan was disguised as a purchase and sale of future receivables agreement, but its terms and conditions and the Defendants' actions in this case demonstrate that despite the agreement's name, no sale of receivables took place and the agreement was intended to be, and was always treated as, a loan. Indeed, the New York Attorney General's Office ("NY AG") has launched an investigation into the predatory lending practices of merchant cash advance ("MCA") companies such as Ram and Richmond and based

Case 1:20-cv-05120-LJL    Document 1-1    Filed 07/03/20    Page 4 of 27

upon documents and emails, the NY AG has concluded that its evidence "strongly indicates," that at least certain of the Defendants have engaged in the very fraudulent conduct alleged below.

## PARTIES

2.      Fleetwood is a Texas limited liability company with a principal place of business at 4558 Steeple Chase Lane, Rockwall, Texas.  Its members are individuals who are citizens of Texas and no member is a citizen of New York.

3.      Upon information and belief: (i) Ram is a New Jersey limited liability company with principal place of business located at 1006 Monmouth Ave., Lakewood, New Jersey; (ii) Ram is authorized to do business in New York; and (iii) Ram purportedly maintains an office for the regular transaction of business at 111 John Street, Suite 1210, New York, New York 10038.

4.      Tsvi Reich a/k/a Steve Reich is an individual residing at 1 W. End Avenue, Apt. 27F, New York, New York 10023, and, upon information and belief, he is the founder, owner and managing member of Ram.

5.      Upon information and belief: (i) Richmond is a New York limited liability company; (ii) Richmond changed its name to RCG Advances LLC on or about May 5, 2019; and (iii) Richmond maintains its principal place of business at 111 John Street, Suite 1210, New York, New York 10038, the same address as Ram's purported New York office.

6.      Upon information and belief, Richmond also operates under the d/b/a Ram Capital Funding.

7.      Robert Giardina is an individual residing at 158 Portage Avenue Staten Island, New York 10314. upon information and belief, Giardina is the founder, owner and managing member of Richmond, and, at various times, has held himself out to be an owner of Ram.

3

## FACTUAL BACKGROUND

**A.      Ram and Richmond.**

8.      Ram and Richmond are MCA companies that advance funds to small business merchants desperate for cash.

9.      Ram itself characterizes its transactions as "loans" and its merchant customers as "borrowers."

10.      Although Ram purports on its website never to sell its loans and to be with its borrowers "every part of the way, from state to finish," that is not the case.  Through shared employees and purported assignment agreements, Ram and Richmond induce merchants to enter into agreements with Ram that are actually funded and serviced by Richmond.

11.      Indeed, in *Ram Capital Funding LLC v. K & S Automotive Professionals LLC d/b/a Midas and Stephen S. Fincher*, Supreme Court of the State of New York, Index No. 034647/2016, and in at least five (5) other matters, Giardina swore, under penalty of perjury, that he was "a Managing Member of Plaintiff Ram Capital Funding, LLC" in order to obtain judgments against merchants who allegedly defaulted under their agreements with Ram.

12.      Another Richmond employee, Michelle Gregg ("Gregg"), also claimed to be a member of Ram in a sworn affidavit submitted in *Ram Capital Funding LLC v. K.S. Printing DBA Print Plus and Chad and Kimberly Choina*, Supreme Court of the State of New York, Niagara County, Index No. E161332/2017, and in more than thirty (30) other matters, she claimed to be an authorized representative of Ram in order to secure judgments.

13.      As further evidence of their relationship, Ram and Richmond purportedly share the same New York office address, Richmond operates under the d/b/a "Ram Capital Funding"

and employees such Gregg communicate with Ram's merchants, including Plaintiff, with email addresses at "ramcapitalfunding.com."

14.     Sometime in 2018, the NY AG launched an investigation (the "Investigation") into the allegedly predatory lending tactics of MCA companies such as Ram and Richmond.

15.     In connection with the Investigation, the NY AG served subpoenas upon various entities, including Richmond, and sought to depose Giardina, Gregg and other Richmond personnel.

16.     Thereafter, Giardina and Gregg commenced an Article 78 proceeding entitled *Robert Giardina and Michelle Gregg v. Letitia James, Attorney General of the State of New York*, Supreme Court of the State New York; County of New York, Index No. 16209/2019 (the "Article 78 Proceeding"), and sought to stay their depositions pending resolution of alleged federal and state criminal investigations into their activities as officers of Richmond.

17.     The relief sought in the Article 78 Proceeding was denied and, on appeal, the NY AG represented to the Appellate Division, First Department, that the documents and emails it had obtained so far "strongly indicate[]" that Richmond and its personnel were engaged in fraudulent and illegal conduct, including:

- Engaging in usury by loaning money to merchants at *annual interest rates in the triple digits*, well above the maximum legal rate under New York law, under the guise of "merchant cash advances," which were purportedly purchases of merchants' future "receivables," but which (like an ultra-high-interest, short-term loan) required merchants to make daily payments to Richmond in fixed amounts.

- Engaging in fraud by, inter alia, providing merchant cash advances in smaller than agreed to amounts and charging higher than agreed fees, . . . , and by continuing to debit a merchant's account after the merchant's advance was repaid.

18.     Fleetwood is a victim of this fraudulent scheme.

### C.   Fleetwood's Business.

19.   Plaintiff Fleetwood is a small business, providing golf course construction, development, renovation and remodeling for courses and country clubs in and around the Dallas area.

20.   As is typical in the industry, Fleetwood invoices its clients for the services it performs on terms payable in 30, 60 or 90 days.  Thus, there is a substantial lag between the time Fleetwood generates an invoice and the time it actually gets paid.

21.   At times, the lag in payment creates cash flow issues for the company.

22.   In November 2016, Fleetwood was experiencing such cash-flow issues when it was contacted by a broker offering financing through Ram.

### D.   Fleetwood enters Agreement with Ram; but the deal is funded by Richmond.

23.   On or about November 28, 2016, Ram and Fleetwood entered into a so-called purchase and sale of receivables agreement (the "Agreement") pursuant to which Ram agreed to advance Fleetwood $100,000 (the "Purchase Price") in exchange for the purported purchase of all of Fleetwood's future receipts (the "Future Receipts") until such time as Fleetwood had repaid Ram the sum of $149,900 (the "Purchased Amount").

24.   The Purchased Amount was to be repaid through daily ACH withdrawals from a designated account (the "Account"), each in the equal amount of $1,399.00 (a "Daily Payment").

25.   Ram, however, did not fund the full Purchase Price.  Indeed, Ram did not fund anything at all.

26.   Instead, Richmond funded just half the Purchase Price ($50,000), via a wire into the Account from a Richmond account at Empire State Bank, and immediately began withdrawing the Daily Payments.

27.     By email on or about December 8, 2016, Fleetwood contacted the broker to request payment of the missing $50,000, but instead was offered a second $50,000 receivables purchase agreement.

28.     When Fleetwood rejected the offer and demanded to speak with Reich, by email dated December 9, 2016, the broker advised that Reich "won't release [the funds] til the New Year."

29.     In other words, Reich and Ram and/or Richmond refused to advance the full Purchase Price until Fleetwood had made at least the 23 payments required in December 2016 which equates to $32,177 or more than 60% of the unpaid $50,000 Purchased Amount.  In effect, Reich and Ram were requiring Fleetwood to fund its own advance.

30.     Neither Ram nor Richmond ever advanced the additional $50,000 required by the Agreement.

31.     The Defendants' failure to advance the full $100,000 to Fleetwood caused further cash flow problems for the company.

32.     By email dated March 17, 2017 to Ram at accounting@ramcapitalfunding.com. Fleetwood requested a brief pause in its Daily Payments because it had not yet received expected payments on certain invoices and it was running low on funds.

33.     Emphatically, Michelle Gregg, purportedly then an Accounting Director of Ram, immediately responded: "UNFORTUNATELY . . . WE DO NOT OFFER "BREAKS".  DOING THAT WOULD PUT YOU IN AUTOMATIC DEFAULT."

34.     After they refused to reduce Fleetwood's payment obligations in light of the slowdown in collections, the Defendants continued to debit Daily Payments from the Account.

7

Case 1:20-cv-05120-LJL   Document 1-1   Filed 07/03/20   Page 9 of 27

Since Ram had only provided half the Purchase Price, it was only entitled to collect half the Purchased Amount or $74,950.

35.     In other words, pursuant to the express terms of the Agreement, by paying only $50,000, the Purchased Amount of receipts was only $74,950.

36.     Notwithstanding the clear terms of the Agreement and the Defendants' failure to advance the full Purchase Price, a total of $119,617 was debited from Fleetwood's Account or $44,667 (the "Excess Funds") more than Ram and/or Richmond was entitled to debit from the Account.

37.     By letter dated April 28, 2017, by and through its attorneys, Fleetwood demanded repayment of the Excess Funds.

38.     To date, Ram and Richmond have failed and refused to return the Excess Funds.

**B.     The Agreement was not a sale of future receivables.**

39.     Notwithstanding its title, the Agreement was not the sale/purchase of receivables. Plain and simple, it was a loan.

40.     The Agreement had none of indicia of a true sale and all the indicia of a loan. Among other things: (i) the Agreement required that the Purchased Amount be repaid from funds other than the purchased Receipts; (ii) the terms of the Agreement failed to transfer the risk and benefits of ownership of the Future Receipts from Fleetwood to Ram, (iii) Fleetwood remained absolutely liable for repayment of the Purchased Amount; (iv) Ram had full recourse rights against Fleetwood and its owner and (v) the Daily Payments were fixed and required payment within the specific time period chosen by Ram.

**i.** **The Agreement required Daily Payments from funds other than proceeds of the purchased Receipts.**

41.     In a typical sale of receivables, the buyer is repaid through the collections of the purchased receivables.  Such was not the case here.

42.     Pursuant to the Agreement, Ram purportedly purchased all of Fleetwood's future Receipts, but required repayment of the Purchased Amount through Daily Payments that purportedly represented the Specified Percentage of each sale of Fleetwood's goods and services (a "Transaction") regardless of whether such sale related in any way to a purchased Receipt.

43.     As the Defendants were well aware, Fleetwood provided golf course restoration and other related services to its clients, invoiced its clients on terms of 30, 60 or 90 days and typically did not receive payment for its invoices until then or later.

44.     Thus, a purchased future receivable, at the earliest, would not typically be paid for 30, 60 or 90 days until after it was generated by Fleetwood.

45.     Nevertheless, per the Agreement, Fleetwood was obligated to begin repaying Ram immediately, forcing Fleetwood to make the Daily Payments with the collections of past receivables or other sources that were not purchased by Ram under the Agreement including the proceeds.

46.     Such a requirement demonstrates the Agreement does not constitute a sale.

**ii.** **The terms of the Agreement failed to transfer the risk and benefits of ownership of the Future Receipts from Fleetwood to Ram.**

47.     The sine *qua non* of any sale is that absolute title and ownership of the allegedly purchased good transfer from the seller to the buyer.  That did not occur in the instant case.

48.     Here, *Fleetwood* was responsible for generating and collecting the Future Receipts, it exercised complete dominion and control over the Future Receipts and it retained the

risk of non-collectability with respect to the Future Receipts. In other words, notwithstanding the assignment language of the Agreement, all of the benefits and risks of ownership of the Receipts remained with Fleetwood.

49.     Pursuant to the Agreement, Fleetwood was responsible for collecting the proceeds of its Transactions and depositing the Specified Percentage of each Transaction into the designated Account so that Ram could debit the Daily Payment.

50.     So long as it made the Daily Payments, Fleetwood was free to use the remaining proceeds of any Transaction, including the proceeds of a supposedly purchased Future Receipt, in its daily operations. Indeed, the excess proceeds were Fleetwood's only source of revenue because the Agreement specifically prohibited Fleetwood from further encumbering the future Receipts. Thus, Fleetwood had to use the proceeds of the allegedly purchased Future Receipts in order to operate its business.

51.     Fleetwood's complete dominion and control over the Future Receipts and its right to use the proceeds of the alleged purchased Future Receipts are entirely inconsistent with a sale because such control and rights are the benefits of ownership that would pass to the seller if the Agreement were a true sale.

52.     Similarly, Fleetwood retained the risk of loss associated with non-payment of the Future Receipts. Among other things, Fleetwood was obligated to perform all due diligence with respect to its customers and if a particular Future Receipt was not collectible, there was no reduction in the Purchased Amount and Ram would be repaid from the next collected Future Receipt or the proceeds of any other Transaction.

### iii. Fleetwood remained absolutely liable for repayment of the Purchased Amount.

53.     By operation of the Agreement's default rights and remedies, repayment of the Purchased Amount was put beyond any risk of non-payment and Fleetwood remained absolutely liable for repayment of the Purchased Amount.

54.     Under the Agreement, if an Event of Default occurred, the Plaintiffs immediately became liable for the full outstanding Purchased Amount, together with additional fees and costs due under the Agreement.

55.     An Event of Default is defined under the Agreement so that a default would occur under any and every conceivable circumstance wherein Fleetwood failed to generate or collect Future Receipts to repay Ram.

56.     Most importantly, the failure of Fleetwood to generate and collect sufficient revenue to make the Daily Payments would automatically constitute an Event of Default under the Agreement after just four days of having insufficient funds ("NSF") in the Account:

> NSF Fee - $75.00 (each) – Up to FOUR TIMES ONLY before a default is declared.

57.     Fleetwood also defaulted under the Agreement if it (i) violated any term of the agreement, (ii) became insolvent or filed for bankruptcy, (iii) transferred or otherwise sold its assets, or (iv) moved, terminated, interrupted or suspended its business in any way.  Accordingly, even if Fleetwood's business were destroyed or suspended by a hurricane, flood, fire, a pandemic or other Act of God, it would be in default of the Agreement and, pursuant to the remedies provided by the Agreement, Plaintiff and its owner would be liable for the full outstanding balance of Purchased Amount, plus all fees and costs due under the Agreement.

11

### iv. Ram retained full recourse rights against Fleetwood.

58.    In order to further ensure its performance under the Agreement, Fleetwood granted Ram a security interest in substantially all of its assets (the "Collateral").

59.    Upon an Event of Default, Ram and/or Richmond was entitled to exercise all of its rights and remedies under the UCC.

60.    Thus, if Fleetwood missed as few as four Daily Payments, Ram and/or Richmond could foreclose on the Collateral.

61.    Additionally, Pamela Fleetwood, as owner of Fleetwood, was obligated to guaranty Fleetwood's performance of certain obligations under the Agreement including, without limitation, the obligation to ensure that Fleetwood had sufficient funds in the Account to make the Daily Payments.

62.    Such recourse provisions are not indicative of a true sale, but rather, a loan.

### v. The Daily Payments were fixed and resulted in a usurious interest rate.

63.    On the face of the Agreement, Fleetwood was required to repay the Purchased Amount through 107 daily ACH debits from the Account, each in the equal amount of $1,399.00.

64.    The Daily Payment was supposed to equal ten percent (10%) of Fleetwood's average daily Receipts, but this definition was purely fictional because, as the Defendants were well aware, Fleetwood did not generate Receipts on a daily basis.

65.    Instead, the specified percentage was purely arbitrary and the amount of the Daily Payment was determined purely by how quickly Ram and/or Richmond wanted to be repaid.

66.    Indeed, regardless of whether it collected any Receipts on a given day, Fleetwood was "responsible for ensuring" that Daily Payments were in the Account.

Case 1:20-cv-05120-LJL   Document 1-1   Filed 07/03/20   Page 14 of 27

67.     Although the Agreement contained a reconciliation provision, it was illusory. Pursuant to the Agreement, "on the eighteen day of each month," Ram would supposedly reconcile the amount it actually collected against Fleetwood's actual receipts and credit Fleetwood if it collected more than 10% of Fleetwood's collections for the preceding month.

68.     Upon information and belief, neither Ram nor Richmond ever reconciled Fleetwood's accounts.

69.     The Agreement also provided that Ram, "may upon Merchant's request, adjust the amount of any payment due under this Agreement at [Ram's] sole discretion and as it deems appropriate."

70.     However, when Fleetwood actually requested a reduction, Gregg emphatically answered that "WE DO NOT OFFER 'BREAKS".

71.     In other words, just like any other loan, Fleetwood was absolutely liable to make the Daily Payments.

72.     Further, on its face, the Agreement charged usurious interest.  According to the terms of the Agreement, Ram and/or Richmond expected repayment of the $100,000 principal plus $49,000 interest in 22 weeks which translates into an annual interest rate of 116%.

73.     The actual interest rate is far greater because Ram and/or Richmond only advanced $50,000 but collected an additional $69,617.00 in 18 weeks which translates into an annual interest of greater than 400%, an amount far in excess of that permitted under either Texas or New York law.

13

## FIRST COUNT

### (Breach of contract/Duty of Good Faith)

74.     Fleetwood repeats and re-alleges the allegations contained in paragraphs 1 through 73 as if more fully set forth herein.

75.     As a party to the Agreement, Ram and Richmond had a duty to act in good faith and fair dealing with the Fleetwood.

76.     Ram and Richmond, without any fault on the part of Fleetwood, failed and refused to act in good faith, with honesty and integrity to perform under the Agreement.

77.     Notwithstanding the clear terms of the Agreement, Fleetwood was only provided a Purchased Price of $50,000 by Ram and/or Richmond, an amount equal to only half of the $100,000 Purchase Price set forth in the Agreement.

78.     By providing only half the Purchase Price, Ram and/or Richmond was entitled to debit no more than half the Purchased Amount or $74,950, from the Account.

79.     However, Ram and/or Richmond debited a total of $119,617 from the Account.

80.     By failing to provide Ram and/or Richmond with the full Purchase Price, but debiting the Account as if the full Purchase Price had been paid, Ram and/or Richmond breached their duties under Agreement with Fleetwood and obtained the Excess Funds.

81.     By reason of the foregoing, Fleetwood is entitled to an award of damages in the amount of $44,667.

## SECOND COUNT

### (Money Had and Received)
### (In the alternative)

82.     Fleetwood repeats and re-alleges the allegations contained in paragraphs 1 through 81 as if more fully set forth herein.

14

83.     By continuing to debit the Account after it had received sufficient funds to repay the Receipts actually purchased under the Merchant Agreement, Rama and/or Richmond received money belonging to Fleetwood to which it has no right to keep.

84.     Despite demand, Ram and/or Richmond has failed and refused to reimburse Fleetwood for the Excess Funds.  Meanwhile, it has benefitted from the use of the Excess Funds.

85.     Under principles of equity and good conscience, Ram and/or Richmond should be not permitted to keep the Excess Funds.

86.     By reason of the foregoing, Fleetwood is entitled to an award of damages in the amount of $44,667.

### THIRD COUNT

### (Texas Usury Statute)

87.     Fleetwood repeats and re-alleges the allegations contained in paragraphs 1 through 86 as if more fully set forth herein.

88.     Tex. Fin. Code §305.001(a-1) and §305.003 each provide that a creditor who contracts for, charges, or receives interest greater than the legal maximum is liable to the obligor for an amount that is equal to three times the difference between the maximum allowable legal interest and the total amount of interest charged.

89.     The maximum interest rate allowed under Tex. Fin. Code §303.009(c) is 28%.

90.     The Agreement charged interest that was twice the maximum 28% permitted by Texas law and also the 25% permitted by New York law.

91.     Fleetwood did, in fact, pay interest to Ram and/or Richmond in excess of 28%.

92.     With respect to Agreement, the most that Ram and/or Richmond could have charged in interest was $4,946.16.

15

Case 1:20-cv-05120-LJL   Document 1-1   Filed 07/03/20   Page 17 of 27

93.     Ram and/or Richmond did, in fact, charge and collect interest of $69,617.00 which translates into an effective interest rate in excess of 400% during the 18 week period in which Ram and/or Richmond debited funds from the Account.

94.     The difference between the actual interest collected ($69,617.00) and the permitted interest ($4,946.16) is $64,770.84 (the "Usurious Interest").

95.     By letter dated September 27, 2019, Fleetwood demanded that Ram and/or Richmond return the Usurious Interest, but Ram and/or Richmond have failed and refused to do so.

96.     By reason of forgoing, pursuant to Tex. Fin. Code §305.001(a), Fleetwood is entitled to statutory damages equal to three times the Usurious Interest which amount equals $194,312.52.

97.     In addition, Tex. Fin. Code § 305.004(a) provides that:  "In addition to the amount determined under Section 305.003, a creditor who charges and receives legal interest that is greater than twice the amount authorized by this subtitle is liable to the obligor for:

(1)     the principal amount on which the interest is charged and received; and

(2)     the interest and all other amounts charged and received.

98.     The Agreement charged interest in excess of 400% which is far more the twice the amount permitted under Texas law.

99.     Accordingly, Fleetwood is also entitled to a return of all principal ($50,000) and legal interest ($4,846) charged by Ram and/or Richmond which amount equals $54,846.

100.    With respect to Fleetwood alone, in addition to the $194,312.52 required under Tex. Fin. Code §305.001(a), Fleetwood is also entitled to $54,846 in total principal, fees and interest charged by Defendants.

101.    By reason of the foregoing violations, Fleetwood is entitled to recover against Ram and/or Richmond an amount to be determined at trial but, in any event, not less than $249,158.52.

## FOURTH COUNT

### (Attorney's Fees/Texas Usury Statute)

102.    Fleetwood repeats and re-alleges the allegations contained in paragraphs 1 through 101 as if more fully set forth herein

103.    Fleetwood has incurred, and will in the future continue to incur reasonable attorney fees as a result of Ram's violations of Tex. Fin. Code §§ 305.001 and 305.003.

104.    Pursuant to Tex. Fin. Code. §305.005, "[a] creditor who is liable under Section 305.001 or 305.003 is also liable to the obligor for reasonable attorney's fees set by the court."

105.    By reason of the foregoing, Fleetwood is entitled to recover from Ram and/or Richmond reasonable attorneys' fees incurred and to be incurred in an amount to be determined at trial.

## FIFTH COUNT

### (RICO:  18 U.S.C. § 1962(c))

106.     Fleetwood repeats and re-alleges the allegations contained in paragraphs 1 through 105 as if more fully set forth herein.

**A.    Culpable Person**

107.    Ram, Richmond, Reich and Giardina are  "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

17

108.     At all relevant times, each of Ram, Richmond, Reich and Giardina was and is, a person that exists separate and distinct from the RICO enterprise, described below.

109.     Ram is a limited liability company organized and existing under the laws of the State of New Jersey.

110.     Upon information and belief, Reich is the owner, managing member and *de facto* chief executive officer of Ram.

111.     Ram solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

112.     Richmond is a limited liability company organized and existing under the laws of the State of New York.

113.     Upon information and belief, Giardina is the owner, managing member and *de facto* chief executive officer of Richmond.

114.      Richmond solicits, underwrites, funds, services and collects upon lawful debt incurred by small business in states that do not have usury laws.

**B.     The Enterprise**

115.     Ram, Richmond, Reich and Giardina constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

116.     Ram, Richmond, Reich and Giardina are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of Texas, New York and other states.

117.    Upon information and belief, since at least 2016 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through shared personnel, shared offices in New York, a common email address (@ramcapitalfunding.com), and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States, including Fleetwood.

118.    The debt, including such debt evidence by the Agreement, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate.  Here, the annualized rate charged to Fleetwood exceeded 300%, a rate that is more than ten times (10x) the maximum twenty-eight percent that is permitted to be charged under Tex. Fin. Code §303.009(c) and the maximum twenty-five percent (25%) that is permitted to be charged under New York Penal Law §190.40.

## C.    Each Member's Role in the Enterprise

119.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts.  Generally speaking, Reich and Ram solicit the merchants, underwrite the transactions and enter into the merchant agreements while Giadina and Richmond fund and collect the proceeds of the usurious loans.  More specifically:

### i.    Reich

120.    Upon information and belief, Reich is the founder, owner, chief underwriter and chief executive officer of Ram.  Upon information and belief, Reich, together with Giardina, is

responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, and the ultimate payment terms, amount and period of each usurious loan, including the Agreement.

121.     Upon and information and belief, in his capacity as the day-to-day leader of the Enterprise, Reich, together with Giardina, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the merchants to whom the Enterprise will lend funds; (ii) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (iii) the amount and repayment period of the usurious loans extended by the Enterprise to merchants; and (iii) the method of collecting the daily payments via ACH withdrawals.  All such forms were used to make and collect upon the unlawful loans including, without limitation, the loan extended to Fleetwood under the Agreement.

122.     Reich has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing members of the Enterprise to make loans to merchants, to fund only certain amounts of those loans and to collect upon the unlawful loans.

123.     Through salary, bonuses, profits or other distributions by Ram, Reich has ultimately benefited from the Enterprise's funneling of a portion or all of the usurious loan proceeds to Ram.

Case 1:20-cv-05120-LJL   Document 1-1   Filed 07/03/20   Page 22 of 27

### ii.   Ram

124.   Directly and through Reich and its other agent employees, Ram has been and continues to be responsible for: (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with investors to fund the usurious loans; (ii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iii) entering into the so-called merchant agreements on behalf of the Enterprise; (iv) setting up the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its name to further collect upon the unlawful debt when a merchant defaults.

125.   In this case, Ram: (i) entered into a contract with a broker to solicit borrowers, including Fleetwood; (iii) underwrote the Agreement; (iv) entered into the Agreement; (v) solicited the information needed to collect upon the unlawful debt evidenced by the Agreement by effecting daily ACH withdrawals from Fleetwood's Account; (vi) sent payoff letters that assisted in the collection of the unlawful debt; and (vi) failed and refused to return the usurious interest charged and collected under the Agreement.

126.   Upon information and belief, Ram ultimately benefits from the Enterprise's unlawful activity by receiving a fee paid from the proceeds of the unlawful debt collected by Enterprise.

### iii.   Giardina

127.   Upon information and belief, Giardina is the founder and sole owner of Richmond and an officer within the company.  Upon information and belief, Giardina, together with Reich, is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the

Enterprise will fund, how such loans will be funded, and the ultimate payment terms, amount and period of each usurious loan, including the Agreement.

128.    Upon and information and belief, in his capacity as the day-to-day leader of the Enterprise, Giardina is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the amount and repayment period of the usurious loans extend by the Enterprise to merchants; and (iii) the method of collecting the daily payments via ACH withdrawals.  All such forms were used to make and collect upon the unlawful loans including, without limitation, the loan extended to Fleetwood under the Agreement.

129.    Giardina has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing members of the Enterprise to make loans to merchants, to fund only certain amounts of those loans and to collect upon the unlawful loans.

130.    Through salary, bonuses, profits or other distributions by Richmond, Reich has ultimately benefited from the Enterprise's funneling of a portion or all of the usurious loan proceeds to Richmond.

### iv.    Richmond

131.    Directly and through Giardina and its other agent employees, Richmond has been and continues to be responsible for: (i) funding the usurious loans entered into by the Enterprise; (ii) serving the usurious loans and (iii) collecting upon the unlawful debt.

Case 1:20-cv-05120-LJL   Document 1-1   Filed 07/03/20   Page 24 of 27

132.    In this case, Richmond: (i) funded the amounts advanced to Fleetwood under the Agreement by a wire transfer dated November 29, 2016 from its account at Empire State Bank; (ii) communicated with Fleetwood concerning the loan through email addresses and signature lines that made it appear Fleetwood was dealing with Ram; and (iii) collected the Daily Payments through the ACH withdrawals from Fleetwood's designated Account into Richmond's account at Empire State Bank.

133.    Upon information and belief, Richmond ultimately benefits from the Enterprise's unlawful activity by receiving all or a portion of the proceeds from the unlawful debt.

**C.    Interstate Commerce**

134.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

135.    Specifically, members of the Enterprise maintain offices in New Jersey and New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Texas, including the Plaintiff, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

136.    In the present case, all communications between the members of the Enterprise and Plaintiffs were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreement, fund the advance under the Agreement and collect the Daily Payments via interstate electronic ACH debits.  In addition, at the direction of Ram, the Agreement was executed by Pamela A. Fleetwood, on behalf of Fleetwood and individually as

guarantor, and the original copy of the Agreement was sent from Texas to Ram at its offices in New Jersey via Federal Express using labels prepared by Ram.

**D.      Injury and Causation**

137.      The Plaintiff has and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.  The injuries to the Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, the tens of thousands of dollars paid to the Defendants by the Plaintiff or otherwise collected by the Defendants on account of the usurious and otherwise unenforceable Agreement and attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting the Defendants' unlawful activities.

138.      Pursuant to 18 U.S.C. § 1964(c), the Plaintiff is entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## SIXTH COUNT

### (Conspiracy under 18 U.S.C. § 1962(d))

139.      Fleetwood repeats and re-alleges the allegations contained in paragraphs 1 through 138 as if more fully set forth herein

140.      The Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

141.      By and through each of the Defendants' business relationships with one another, including shared employees and services, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the

Case 1:20-cv-05120-LJL   Document 1-1   Filed 07/03/20   Page 26 of 27

underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

142.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreement.

143.    More particular to this case Ram underwrote and entered into the Agreement, but Richmond funded and collected upon loan by: (i) using email addresses at "ramcapitalfunding.com," representatives of Richmond serviced the loan; and (iii) using its letterhead, Ram directed that Fleetwood make payments under the loan to Richmond's account at Empire State Bank.

144.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

145.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.  The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, tens of

FILED: NEW YORK COUNTY CLERK 03/18/2020 04:09 PM

Case 1:20-cv-05120-LJL   Document 1-1   Filed 07/03/20   Page 27 of 27

thousands of dollars in improperly collected loan payments and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and prosecuting the RICO Defendants' criminal activities.

146. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

**WHEREFORE,** Fleetwood seeks entry of a judgment against the Defendants as follows:

(i)     on the First Count, awarding damages in the amount to be determined at trial but not less than $44,667; and

(ii)    on the Second Count, awarding damages in the amount to be determined at trial but less than $44,667; and

(iii)   on the Third Count, awarding damages in the amount to be determined at trial but not less than $249,158.52; and

(iv)    on the Fourth Count, awarding reasonably attorney fees in an amount to be determined at trial but, in any event, not less than $50,000; and

(v)     on the Fifth Count, awarding actual damages in an amount to be determined at trial but not less than $119,617 and treble damages of an amount not less than $358,851; and

(vi)    on the Fifth Count, awarding actual damages in an amount to be determined at trial but not less than $119,617 and treble damages of an amount not less than $358,851; and

(vii)   for such other and further relief as the Court shall deem just and proper.

Dated: March 18, 2020
        New York, New York

**WHITE AND WILLIAMS LLC**

Shane R. Heskin, Esq.
Stuart J. Wells, Esq.
7 Times Square,
New York, New York 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
wellss@whiteandwilliams.com
*Attorneys for Plaintiff Fleetwood Services LLC*

24327021v.1