UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
:
FLEETWOOD SERVICES, LLC,                          :
:
                                Plaintiff,        :
:
                    -v-                           :
:
RAM CAPITAL FUNDING, LLC, TSVI REICH a/k/a        :
STEVE REICH, RICHMOND CAPITAL GROUP LLC           :
n/k/a RCG ADVANCES LLC, and ROBERT                :
GIARDINA,                                         :
:
                                Defendants.       :
:
-------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:__6/6/2022__

20-cv-5120 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiff Fleetwood Services, LLC ("Plaintiff" or "Fleetwood") moves, pursuant to

Federal Rule of Civil Procedure 56, for an order granting it summary judgment with respect to

the five causes of action it brought in the Amended Complaint.  Dkt. No. 74.

For the following reasons, the motion for summary judgment is granted in part and

denied in part.

## BACKGROUND

The following facts are undisputed for the purposes of summary judgment except where

otherwise indicated.

## I.    The Parties

Fleetwood is a small Texas business, providing golf course construction, development,

renovation, and remolding for courses and country clubs in and around the Dallas area.   Dkt.

No. 79 ¶ 11.  Its owners are Pamela Fleetwood and Robert Fleetwood.  *Id.* ¶ 15.  Richmond

Capital Group n/k/a RCG Advances LLC ("Richmond") is a New York limited liability company

that also operates under the name Ram Capital Funding ("Ram Capital"). *Id.* ¶ 2. Robert Giardina ("Giardina" and together with Ram Capital, "Defendants") is the founder and sole managing member of Richmond. *Id.* ¶ 3. Ram Capital Funding LLC ("Ram LLC") and Tsvi Reich a/k/a Steve Reich were initially named as defendants in this action, but Fleetwood voluntarily dismissed its claims against them after entering into a settlement agreement with those entities in September 2020. *See* Dkt. No. 13; Dkt. No. 28 at 1 n.1; Dkt. No. 38-14. Richmond d/b/a Ram Capital and Ram LLC were both involved in the cash advance business. Dkt. No. 78-10 at 19–20.

Beginning at least as early as July 2015 and continuing through the end of 2018, Richmond was in the business of advancing funds to small businesses in Texas and throughout the United States. Dkt. No. 79 ¶ 4. Richmond advanced these funds pursuant to agreements called "Merchant Agreements." Each of the Merchant Agreements used by Richmond contained identical assignment and payment language, representations and warranties, events of default, default rights and remedies, a security agreement, a personal guaranty, a reconciliation provision, and Automated Clearing House ("ACH") authorization terms. *Id.* ¶ 5. In connection with the transactions governed by each of the Merchant Agreements, merchants were required to complete a form that provided Richmond with the merchant's log-in information to its bank account; it stated: "[t]he way your advance is set up RCG needs viewing access to your bank accounts each business day in order to calculate the amount of your daily payment." *Id.* ¶ 7. In addition, each merchant was required to execute a confession of judgment that, upon an event of default, permitted Richmond to obtain a judgment against the merchant and any guarantor in New York without notice or the need to commence a plenary action. *Id.*

## II.     The Fleetwood Agreement

In November 2016, as it was experiencing cash-flow issues, Fleetwood was contacted by a broker offering financing through Ram LLC.  *Id.* ¶ 12.  On or about November 28, 2016, Fleetwood entered into a Merchant Agreement written on the paper of Ram LLC (the "Fleetwood Agreement" or the "Agreement"), listing "Ram Capital Funding LLC ("RCF")" as the counterparty.  *Id.* ¶ 13; Dkt. No. 77-4 at 1.  Though the Agreement was on the paper of Ram LLC, Richmond advanced the $100,000 purchase price (the "Purchase Price"), less applicable fees, to Fleetwood, and Richmond collected the daily payments due pursuant to the Agreement. Dkt. No. 79 ¶ 35.

The Fleetwood Agreement was identical in form and substance to the Merchant Agreements.  *Id.* at ¶ 13.  As part of the transaction (the "Fleetwood Transaction"), Pamela and Robert Fleetwood also executed (i) a security agreement and personal guaranty; (ii) a confession of judgment; and (iii) an authorization agreement for direct deposit and direct payments.  *Id.* ¶ 15.  The provisions of the Fleetwood Agreement are analyzed elsewhere in this Opinion; here, it is sufficient to describe certain of the material terms.  Pursuant to the terms of the Fleetwood Agreement, Ram LLC agreed to advance Fleetwood $100,000 in exchange for the purported purchase of what was defined as all of Fleetwood's "future receivables" until Fleetwood had repaid the sum of $149,900 (the "Purchased Amount").  *Id.* ¶¶ 16, 44.  The Purchased Amount was to be repaid through daily ACH withdrawals from a designated account (the "Designated Account") located at a Texas branch of JPMorgan Chase Bank, N.A., each in the equal amount of $1,399.00, which was stated to equal 10% of Fleetwood's daily receipts.  *Id.* ¶¶ 17–18, 45.

The first paragraph of the Fleetwood Agreement contains the provision regarding the purported "Purchase and Sale of Future Receivables" and reads in part as follows:

## PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant" or "Seller") hereby sells, assigns and transfers to RCF ("RCF" or "Buyer") (making RCF the absolute owner) in consideration of the funds provided ("Purchase Price") [$100,000] specified, below, all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to RCF.

The Purchased Amount [$149,900] shall be paid to RCF by Merchant's irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to, and preapproved by, RCF (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") [10%] of the Merchant's settlement amounts due from each Transaction, until such time as RCF receives payment in full of the Purchased Amount.  Merchant hereby authorizes RCF to ACH Debit the specified remittances from the merchant's Account on a daily basis and will provide RCF with all required access codes, and monthly bank statements.   Merchant understands that it is responsible for ensuring that the specified percentage to be debited by RCF remains in the Account and will be held responsible for any fees incurred by RCF resulting from a rejected ACH attempt or an event of default.  RCF is not responsible for any overdrafts or rejected transactions that may result from RCF's ACH debiting the specified amounts under the terms of this agreement.  RCF will debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements on or about the eighteenth day of each month reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited each month equals the specified percentage.  RCF may, upon Merchant's request, adjust the amount of any payment due under this Agreement at RCF's sole discretion and as it deems appropriate.  Notwithstanding anything to the contrary in this Agreement or in any other agreement between RCF and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%.  A list of all fees applicable under this Agreement is contained in Appendix A.

Dkt. No. 77-1 at 1; *see also* Dkt. No. 79 ¶¶ 48–49, 52.   Although stated to be for "future

receivables," the defined term "Transaction" is broader.  It includes "the payment of monies

4

from Merchant's customers' and/or other third party payors . . . for the payments due to Merchant as a result of Merchant's sale of goods or services."  Dkt. No. 77-1 at 1.

Section 3.1 of Fleetwood Agreement with respect to "Events of Default" reads as follows:

> **3.1 Events of Default**.  The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) Merchant shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) the sending of notice of termination by Merchant; (e) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (f) Merchant shall transfer or sell all or substantially all of its assets; (g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (f) Merchant shall use multiple depository accounts without the prior written consent of RCF; (i) Merchant shall change its depositing account without the prior written consent of RCF; (j) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; or (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with RCF.

Dkt No. 77-1 § 3.1.  Appendix A to the Agreement provides that there is a fee for insufficient funds in the Designated Account but provides that it shall be "[u]p to FOUR TIMES ONLY before a default is declared."  *See* Dkt. No. 77-1 at ECF p. 7; Dkt. No. 79 ¶ 58.  An authorization agreement signed by Robert Fleetwood authorized Ram LLC to debit the Designated Account $1,399.00 each day, Monday through Friday.  Dkt. No. 77-1 at ECF p. 6.

Upon an Event of Default, the full amount of the outstanding Purchased Amount plus any additional fees, including legal fees, became immediately due and owing.  Dkt. No. 79 ¶ 60.  In that case, the counterparty to the Agreement had the ability to exercise all rights or remedies available at law or in equity or as a secured creditor under the Uniform Commercial Code.  *Id.* In addition, upon an Event of Default, it had the right to: (i) obtain insurance, (ii) collect monies

due and owing from Fleetwood's account debtors; (iii) receive, endorse and collect any checks, notes, drafts of other chattel paper; (v) sign Fleetwood's name to any invoice and direct that Fleetwood's customers pay the counterparty and (vi) file any claims or pursue any actions to collect upon a Fleetwood receivable.[1]  *Id.* ¶ 61.

In connection with the Fleetwood Agreement, Fleetwood granted Richmond a security interest in and lien upon: (a) "all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory"; (b) all proceeds thereof; and (c) "all funds at time in the Merchant's Account, regardless of the source of the funds." *Id.* ¶ 63.  To further secure Fleetwood's performance under the Fleetwood Agreement, Pamela and Robert Fleetwood personally guaranteed Fleetwood's "good faith, truthfulness, and performance of all representations, warranties and covenants" in the Agreement (the "Personal Guaranties").  *Id.* ¶ 64.  And, pursuant to Sections 1.11 and 2.9 of the Fleetwood Agreement, if Fleetwood filed for bankruptcy Pamela and Robert Fleetwood's obligations under the Personal Guaranties would be triggered. *Id.* ¶ 65.

The Fleetwood Agreement contains a choice of law clause.  It reads, in relevant part, as follows:

> 4.5  **<u>Binding Effect: Governing Law, Venue and Jurisdiction</u>**.  .  .  .  This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principles of conflicts of law.

Dkt. No. 72-4 § 4.5.

---

[1] In its Rule 56.1 Statement, Plaintiff refers to the counterparty of the Fleetwood Agreement as "Richmond," even though it is written on the paper of Ram LLC and Ram LLC is identified as the counterparty in the text of the Agreement.  For ease of reference, and because the Court concludes that Richmond performed the obligations under the Fleetwood Agreement, the Court will refer to Fleetwood's counterparty to the Agreement as Richmond in this Opinion.

The Agreement was signed by Robert Fleetwood and Pamela Fleetwood on behalf of Fleetwood with a physical address in Rockwall, Texas.  *Id.* at 1.  It was not countersigned by Ram LLC.  *Id.*; *see also* Dkt. No. 79 ¶ 19.  The address for Ram Capital Funding, LLC listed on the agreement is in Lakewood, New Jersey.  Dkt. No. 77-1 at 1.  Richmond is a New York limited liability company.  Dkt. No. 79 ¶ 2.

In connection with the Fleetwood Agreement, Pamela Fleetwood received and executed a form that requested her to provide information to access the Designated Account so that Richmond could calculate the daily payment amount.  *Id.* ¶ 57.  The form stated:

> Please note that the way your advance is set up RCF needs viewing access to your bank account each business day in order to calculate the amount of daily payment

*Id.*

## III.    Richmond's Funding Pursuant to the MCA

On November 29, 2016, the sum of $44,500 was wired into the Designated Account from an account at Empire State Bank in the name of Richmond (the "Empire Account").  *Id.* ¶¶ 21–22; 39.[2]  The "Wire Transfer of Funds Notice" issued by Empire State Bank for this transaction reflects that the originator was "Richmond Capital Group LLC" with the contact email "rgiardina@richmondcapitalgroup.com" and that the wire was charged to an identification number that corresponds to Richmond's identification number.  Dkt. No. 78-17.

The wire transfer was reflected in the Designated Account statement by a notice that read in part: "Fedwire Credit Via: Empire State Bank . . . Richmond Capital Group LLC, New York NY."  Dkt. No. 79 ¶ 40.  The Empire Account had been opened by Richmond in or around June 2016 in the name "Richmond Capital Group d/b/a RAM Capital Funding."  Dkt. No. 78-16;

---

[2] In one paragraph, Plaintiff's Rule 56.1 Statement refers to the payment being made on November 29, 2021.  *See* Dkt. No. 79 ¶ 21.  That is obviously a typographical error.  The Court uses the date in the underlying evidence.

Dkt. No. 79 ¶¶ 36–37.  The sum wired on November 29th equaled half the Purchase Price less applicable fees.  Dkt. No. 79 ¶ 23.  By email on or about December 8, 2016, Fleetwood contacted its broker to request payment of the remaining $50,000.  *Id.* ¶ 24.  In response, Fleetwood was offered a second $50,000 receivables purchase agreement, but Fleetwood rejected the offer and demanded payment of the full Purchase Price.  *Id.* ¶¶ 24–25.  Fleetwood was then told that the additional funds "won't release til [sic] the New Year."  *Id.* ¶ 25.  Neither Ram LLC nor Richmond ever advanced the additional $50,000 owed pursuant to the Fleetwood Agreement, *id.* ¶ 26, and Ram LLC never advanced any funds to Fleetwood, *id.* ¶¶ 22, 26, 35.  Nor did Ram LLC sign the Fleetwood Agreement.  *Id.* ¶ 19.

On or around July 17, 2016, shortly after Richmond opened the Empire Account, Richmond entered into an agreement with Actum Processing ("Actum"), pursuant to which Actum agreed to provide ACH services to Richmond d/b/a Ram Capital.  *Id.*  ¶ 38.  On November 30, 2016, Actum, on behalf of Richmond d/b/a Ram Capital, effected a withdrawal of $1,399 from the Fleetwood Account.  *Id.* ¶¶ 41–42.  Thereafter, from November 30, 2016 through and including April 10, 2017, Actum continued to deduct daily payments—almost always in the amount of $1,399[3]—from the Fleetwood Account on behalf of Richmond d/b/a Ram Capital.  *Id.* ¶ 43; Dkt No. 77-7.[4]  By email dated March 17, 2017 to Richmond at its d/b/a Ram Capital email address, Fleetwood requested a brief pause in its daily payments because it had not yet received expected payments on certain invoices and was running low on funds.  *Id.* ¶ 27.  A collection agent, Michelle Gregg, immediately responded: "UNFORTUNATELY … WE

---

[3] The accompanying bank records reflect that $1,399 was occasionally deducted twice in one day around holidays, and that for five days in March 2017, only $700 per day was deducted. *See* Dkt. No. 77-7.
[4] Plaintiff's Rule 56.1 Statement recites dates in the year 2021, *see id.* ¶¶ 41–43 but the actual underlying evidence refers to 2016 to 2017.  The Court uses the underlying evidence.

DO NOT OFFER 'BREAKS'.  DOING THAT WOULD PUT YOU IN AUTOMATIC DEFAULT," and Richmond continued to debit amounts from the Fleetwood Account.  *Id.* ¶¶ 28–29.  By April 2017, a total of $119,617 had been debited from the Fleetwood Account—$44,667 more than Richmond was entitled to under the Fleetwood Agreement.  *Id.* ¶ 31; *see also* Dkt. No. 77 ¶ 17 ("Since Richmond had only provided half the Purchase Price, it was only entitled to collect half the Purchased Amount or $74,950.").  By letter dated April 28, 2017, Fleetwood, by and through its attorneys, demanded that the sum of $44,667 (the "Excess Funds") be returned to Fleetwood.  Dkt.  ¶¶ 31–32.  By letter dated September 27, 2019, Fleetwood's counsel again demanded the return of the Excess Funds plus additional amounts deemed to be usurious interest under Texas law.  *Id.* ¶ 33.  To date, Richmond has not returned any funds to Fleetwood.  *Id.* ¶ 34.  And notwithstanding the provision regarding reconciliations in the Fleetwood Agreement, Richmond never performed a reconciliation on Fleetwood's account.  *Id.* ¶ 53; *see also id.* § 54 ("Richmond never reviewed a merchant's account to determine the proper amount of a daily payment and it never reconciled any merchant's account.").

On the assumption, discussed below, that the Agreement constituted a loan, the relationship between the Purchase Price and the Purchased Amount calculated over the 107 days from when the Purchase Price was to be paid and the Purchased Amount was to be returned would translate to an annual interest rate of 99.8%.  When the excess withdrawals are taken into consideration, the nominal interest rate would be 278.5% per annum.  Dkt. No. 78-19 at ECF p. 9.

## IV.    Other Similar MCAs

Richmond and Giardina have engaged in similar conduct with other merchants.  On or about June 10, 2020, the New York Attorney General (the "NYAG") filed a petition against Richmond, Giardina, and others in *James v. Richmond Capital Group LLC*, Index No.

451328/2020 (the "NYAG Action"), alleging, among other things, that Richmond, Giardina, and others have preyed upon thousands of small businesses throughout the United States by offering funding under "merchant cash advances" that "are in fact fraudulent, usurious loans with interest rates in the triple and even quadruple digits, far above the maximum rate permissible for a loan under New York law."  Dkt. No. 79 ¶¶ 66–67.  Shortly after the commencement of the NYAG Action, the Federal Trade Commission commenced a separate action against Richmond, Giardina, and others entitled *Federal Trade Commission v. RCG Advances, LLC*, No. 20-cv-4432 (S.D.N.Y.), alleging that defendants engaged in deceptive conduct including, among other things, promising consumers specific amounts of financing but providing a much smaller amount, making unauthorized debits from merchant accounts and threatening physical violence when the merchants advise that they cannot make the payments required by the Agreements.  *Id.* ¶¶ 68-69.

The NYAG has obtained affidavits from merchants testifying that Richmond never performed any reconciliations and failed and refused to reduce their daily payments when the merchant's receivable collections slowed down; instead of reducing the daily payments, Richmond threatened to destroy the merchant's business and, in some instances, implied that they would harm the merchant's owner if the merchant failed to make the daily payments required by the Agreements.  *Id.* ¶¶ 71-72.  Those affidavits are undisputed on this record.  *See* Dkt. No. 78-32.

For example, Richmond refused to grant a reduction to the owner of another Texas entity, Texas Tactical Gear & Firearms, who had explained that it anticipated a slowdown in receivables and would be unable to make daily payments; Richmond continued to withdraw the daily payments until the company could not make any further payments and defaulted.  *Id.* ¶ 73.

When a small chocolatier in Las Vegas, Nevada was unable to make the required daily payments due to a seasonal business slowdown in the Spring of 2017 and requested a reduction in the amount of its payments, Richmond responded: "We will take everything from you. . . . We are from New York. . . . Don't mess with us." *Id.* ¶ 74.  Richmond has offered no evidence to dispute this, despite offering a 30(b)(6) witness to answer questions about Richmond's other customers. *See generally* Dkt. No. 78-32 at 110–15.

Richmond responded similarly to a request for a payment reduction by J.B. Plumbing & Heating of Virginia, Inc., a small family-owned company located in Virginia.  When the merchant's owner called Richmond in December 2015 and requested a one-week adjustment of its payments because the company was awaiting payments of receivables from its clients, Richmond refused the request and responded: "I don't care about your problems," and "I'll default you before you can get out of the bathroom." *Id.* ¶ 75.

In another instance, Richmond advanced funds to a Brooklyn synagogue operating under the name Congregation Shule, Inc.  When the synagogue's donations slowed down in October 2017 and were insufficient to make the daily payments, Richmond did not reconcile the synagogue's account and responded to the synagogue's request for a reduction in payments with a series of vivid physical threats. *Id.* ¶¶ 76-77.  After Richmond obtained a confessed judgment against the rabbi and synagogue, its harassment grew more intense with threats of a sexual and physical nature to the point where the Rabbi was forced to apply for an order of protection, which the Rabbi received. *Id.* ¶ 78.

## V.    Invocation of the Fifth Amendment and the 30(b)(6) Testimony

In depositions conducted in this case, Giardina and two other individuals who worked as contractors to Richmond, Michelle Gregg and Jose DaSilva, invoked their Fifth Amendment rights against self-incrimination to virtually every question asked of them in deposition. *Id.* ¶¶

82–83.  Those questions included whether Giardina had been "involved in any transactions involving Fleetwood Services" or involved in or aware of any transactions "between Fleetwood Services and Richmond," Dkt. No. 78-28 at 68:25–69:11, whether the Fleetwood Transaction was funded by Richmond, *id.* at 71:7–71:12; Dkt. No. 78-30 at 39:7–39:13, whether Giardina was involved in negotiating the terms of the Fleetwood Transaction, Dkt. No. 78-28 at 75:2–75:5, whether the daily payments under Richmond agreements had a connection to a merchant's anticipated sales amounts, *id.* at 84:21–85:23, and whether Richmond monitored merchant accounts to ensure that it was collecting only a specified percentage of the merchant's daily receipts, *id.* at 86:17–87:23; Dkt. No. 78-30 at 55:10–56:24.

Fleetwood took the 30(b)(6) deposition of a corporate representative of Richmond.  *Id.* ¶¶ 84–85.  The representative testified on behalf of Richmond that she was not aware of any grounds to dispute the following allegations in the Amended Complaint, among others: (i) the Fleetwood Agreement failed to transfer the benefits and risks of ownership from Fleetwood to Richmond; (ii) Fleetwood remained absolutely liable for repayment of the Purchased Amount and Richmond retained full recourse rights against Fleetwood; (iii) the daily payments were fixed and resulted in a usurious interest rate; and (iv) Giardina exercised control over Richmond and the alleged RICO enterprise.  *Id.* ¶ 86; *see generally* Dkt. No. 78-31

## PROCEDURAL HISTORY

Plaintiff filed this action on or about March 18, 2020 in New York State Supreme Court asserting a number of claims, including a violation of the Racketeer Influenced Corrupt Organizations Act ("RICO").  Dkt No. 1.  On July 3, 2020, Defendants removed the action to this Court on the basis of federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331, 1332, 1441, and 1446.  Dkt No. 1.

On December 7, 2020, Plaintiff filed its First Amended Complaint.  Dkt No. 28.
Plaintiff's first cause of action asserts a claim for breach of contract and breach of the duty of
good faith and fair dealing as a result of Richmond's provision of only $50,000 towards the
purchase price (rather than the full $100,000), entitling Richmond to debit no more than half the
Purchased Amount of $74,950 from the Fleetwood Account; Plaintiff alleges it is entitled to an
award of damages in the amount of $44,667, the excess of the amount that was taken from the
Fleetwood Account over the amount to which Richmond would have been entitled based on half
of the Purchase Price.  *Id.* ¶¶ 114–124.  Plaintiff's second cause of action pleads, in the
alternative, a claim for money had and received for Richmond's retention of the Excess Funds in
the amount of $44,667.  *Id.* ¶¶ 125–129.  The third count pleads a claim for violation of the
Texas usury statute, Tex. Fin. Code § 305.001(a-1) and § 305.003 on the theory that the sums
extended pursuant to the Merchant Agreement were a loan and that the rate of interest on that
loan was 400%, more than twice the maximum of 28% permitted by Texas law and above the
rate of interest permitted by New York law.  *Id.* ¶¶ 130–149.  The fourth count contains a claim
for reasonable attorneys' fees under the Texas usury statute, Tex. Fin. Code § 305.001 and
305.003.  *Id.* ¶¶ 150–153.  Finally, count five asserts a claim for violation of RICO, 18 U.S.C. §
1962(c) against Giardina.  *Id.* ¶¶ 154–179.

On May 18, 2020, the Court issued an Opinion and Order which, among other things,
denied Defendants' motion to dismiss the complaint.  Dkt. No. 56.

On September 28, 2021, Plaintiff filed this motion for summary judgment.  Dkt. Nos. 74-
79.  Defendants filed an affirmation in opposition to the motion for summary judgment on
October 18, 2021.  Dkt. No. 80.  On November 2, 2021, Plaintiff filed a reply memorandum of

law in further support of the motion for summary judgment along with a response to defendant's

statement of facts and a reply affirmation.  Dkt. Nos. 81-83.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 322–23 (1986).  "A genuine issue of material fact exists if 'the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v.*

*Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The movant bears the burden of 'demonstrat[ing] the

absence of a genuine issue of material fact.'"  *Id.* at 114 (quoting *Celotex*, 477 U.S. at 323).  In

deciding a motion for summary judgment, the Court must "construe the evidence in the light

most favorable to the non-moving party, and draw all reasonable inferences in its favor."

*Gilman v. Marsh & McLennan Cos., Inc.*, 826 F.3d 69, 73 (2d Cir. 2016).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  It may not rely

on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d

159, 166 (2d Cir. 2010) (citation omitted), or "on the allegations in [its] pleading, or on

conclusory statements, or on mere assertions that affidavits supporting the motion are not

credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation

omitted).  Rather, to survive a summary judgment motion, the opposing party must establish a

genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P.

56(c)(1)(A), and demonstrating more than "some metaphysical doubt as to the material facts,"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied.  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9–10 (2d Cir. 1983).

Defendant Giardina and others associated with Richmond refused to answer questions in reliance on their Fifth Amendment privilege against self-incrimination.  "A defendant in a civil proceeding who invokes the Fifth Amendment as a result of an overlapping criminal investigation or proceeding risk[s] the adverse inference arising from [his or her] assertion of the privilege." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97–98 (2d Cir. 2012) (internal citations omitted).  However, even at trial, "'[i]f defendants choose to remain silent, the adverse inference that may be drawn will be only one of a number of factors the factfinder will consider and will be given no more evidentiary value than the facts of the case warrant.'"  *Id.* at 103 (quoting *United States v. Dist. Council of New York City*, 782 F. Supp. 920, 925–26 (S.D.N.Y.1992)).  The Fifth Amendment permits, but does not require, the jury to draw "adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them," *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); it is up to the jury to decide whether it should draw an adverse inference and how much weight to put on that inference.  It follows that "adverse inferences cannot be drawn against a non-moving party at summary judgment based on an invocation of the Fifth Amendment privilege." *Amusement Indus., Inc. v. Stern*, 721 F. App'x 9, 11 (2d Cir. 2018) (summary order) (citing *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 93 n.25 (2d Cir. 2016)); *see also S.E.C. v. Suman*, 684 F. Supp. 2d 378, 386–87 (S.D.N.Y. 2010) ("[A] motion for summary judgment cannot be granted on an adverse inference alone.").  Where the party moving for summary judgment bears

the burden of proof on a particular element, "invocation of the Fifth Amendment is not a substitute for relevant evidence" and does not free a litigant "from adducing proof in support of a burden which would otherwise have been his." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83 (2d Cir. 1995) (internal quotation marks omitted). Thus, on summary judgment, a defendant's invocation of the Fifth Amendment may functionally prevent the defendant from offering evidence in opposition to the motion, such that "'the lack of testimony from . . . witnesses [who took the Fifth Amendment] meant that there was no record evidence to dispute the overwhelming evidence' proffered by the moving party," *Amusement Indus., Inc.*, 721 F. App'x at 11 (quoting *In re 650 Fifth Ave. & Related Props.*, 830 F.3d at 93 n.25), but it will not itself satisfy the plaintiff's burden—as the moving party—to demonstrate that facts exist supporting its right to judgment on each element as to which it bears the burden of proof.

Richmond's corporate representative, testifying pursuant to Federal Rule of Civil Procedure 30(b)(6), was confronted with many of the allegations in the Amended Complaint and testified that she had no information that would refute those allegations. *See* Dkt. No. 78-32 at 75–77, 82, 84–86. The representative thus indicated on behalf of Richmond that there were no sources that Plaintiffs needed to discover in order to refute any potential answers by Richmond to those allegations. That testimony "is 'binding' in the sense that whatever [an organization's] deponent says can be used against the organization," although it does not "preclude[] the deponent from correcting, explaining, or supplementing its statements." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34 (2d Cir. 2015). "[B]ecause a Rule 30(b)(6) designee testifies on behalf of the entity, the entity is not allowed to defeat a motion for summary judgment based on an affidavit that conflicts with its Rule 30(b)(6) deposition or contains information that the Rule

30(b)(6) deponent professed not to know." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1103

(9th Cir. 2018) (quoting *Moore's Federal Practice* § 30.25[3]).[5]

# DISCUSSION

Plaintiff moves for summary judgment on all five of its claims.  As noted, it asserts

claims for usury and RICO, as well as for breach of contract and the duty of good faith and fair

dealing and for money had and received.  It argues that the undisputed facts entitle it to summary

judgment on the usury and RICO claims.  In the event that the Court decides that the Fleetwood

Agreement does not constitute a loan giving rise to a claim for usury, it argues that it is entitled

to summary judgment on the contract and money had and received claims.  The preliminary

question is the proper characterization of the Fleetwood Agreement—that is, whether the

agreement constitutes a loan or a true purchase of future receivables.  The Court starts there and

then continues to address Plaintiff's entitlement to summary judgment.

## I.      Whether the Fleetwood Agreement Constitutes a Loan

The parties agree that New York law applies to the interpretation of the Fleetwood

Agreement.  *See* Dkt. No. 76 at 16–18 (Plaintiff arguing that New York law applies to the

interpretation of the Agreement because there is no conflict between the relevant New York and

---

[5] Local Civil Rule 56.1 states that "[e]ach numbered paragraph in the [moving party's] statement of material facts . . . will be deemed to be admitted for the purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party," Local Civ. R. 56.1(c), and that "each statement controverting any statement of material fact[] must be followed by citation to evidence which would be admissible," *id.* at (d).  Assertions that Defendants lack information to deny facts contained in the statement is insufficient, without more, to render those facts genuinely disputed.  The Court will consider such statements to be undisputed.  *See Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 12–13 (2d Cir. 2018) (summary order) (holding that the district court did not abuse its discretion in "crediting as undisputed those facts that [plaintiff] did not properly controvert in her opposition" where "defendants properly cited to the record to support their facts," the district court conducted some scrutiny into the record, and the plaintiff responded to defendants' Rule 56.1 statement "by stating, for example, she 'lacks sufficient knowledge or information to admit or deny'").

Texas laws); Dkt. No. 80 at ECF p. 7–8 (Defendants arguing that New York law generally applies because of the Agreement's choice-of-law clause); *cf. Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, 2019 WL 1244294, at *6 (S.D.N.Y. Mar. 18, 2019) (*"Where '[t]he parties' briefs assume' that a certain body of law controls, 'such implied consent is sufficient to establish choice of law.'"* (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).

New York and Texas apply similar principles in determining whether a transaction constitutes a true sale or a secured loan. The hallmark of a loan is that the lender "'is absolutely entitled to repayment under all circumstances,'" or put otherwise, the "principal sum is repayable absolutely." *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 312 (2d Dep't 2020) (quoting *K9 Bytes, Inc. v. Arch Cap. Funding, LLC*, 57 N.Y.S.3d 625, 632 (Sup. Ct. Westchester Cnty. 2017)). "[T]he name, color, or form which the parties have seen fit to give [an agreement]" are not dispositive, *id.*; rather, the court considers the agreement "'in its totality and judge[s] it by its real character,'" to determine whether it constitutes a loan. *Id.* (quoting *Abir v. Malky, Inc.*, 873 N.Y.S.2d 350, 354 (2d Dep't 2009)); *see also Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612, 621–22 (N.Y. 2021) ("When determining whether a transaction is a loan, substance—not form—controls."); *Gonzalez Cnty. Sav. & Loan Ass'n v. Freeman*, 534 S.W.2d 903, 906 (Tex. 1976) ("It has often been said that courts will look beyond the form of the transaction to its substance in determining the existence or nonexistence of usury. . . . Labels put on particular charges are not controlling."). The analysis usually is guided by examining three factors to "determin[e] whether repayment is absolute or contingent: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding*, 122 N.Y.S.3d at 312. A reconciliation provision is relevant because it can shift the risk of

nonpayment away from the merchant by "allow[ing] the merchant to seek an adjustment of the amounts being taken out of its account based on its cash flow (or lack thereof). If a merchant is doing poorly, the merchant will pay less and will receive a refund of anything taken by the company exceeding the specified percentage. . . . If there is no reconciliation provision, the agreement may be considered a loan." *K9 Bytes, Inc., LLC*, 57 N.Y.S.3d at 632–33. Moreover, if the amount of monthly payments can change pursuant to reconciliations, then the term of the agreement is necessarily not finite. *See Principis Cap., LLC v. I Do, Inc.*, 160 N.Y.S.3d 325, 327 (2d Dep't 2022). And "[i]f the term is indefinite, then it 'is consistent with the contingent nature of each and every collection of future sales proceeds under the contract.'" *K9 Bytes, Inc., LLC*, 57 N.Y.S.3d (quoting *Ibis Cap. Grp., LLC v. Four Paws Orlando LLC*, 2017 WL 1065071, at *5 (Sup Ct. Nassau Cnty. Mar. 10, 2017)). In determining whether the merchant retains the risk of nonpayment, it is significant that "the agreement provides that [defendant's] written admission of its inability to pay its debt or its bankruptcy constitute events of default under the agreement, which entitle the plaintiff to the immediate full repayment of any of the unpaid purchased amount." *LG Funding*, 122 N.Y.S.3d at 313. The *LG Funding* court explained that certain features of an agreement suggested that the merchant's "obligation to repay was absolute and not contingent on its actual accounts receivable," including that:

> [t]he agreement provides that in the event [the merchant] files for bankruptcy or is placed under an involuntary filing, the plaintiff would be entitled to enforce the provisions of the personal guaranty executed by [the individual defendants], [the merchant defendant] would be required to deliver to the plaintiff a confession of judgment in the amount of the purchased amount, and the plaintiff would be allowed to enter the confession of judgment as a judgment.

*Id.*

The three factors provide only a guide to analysis. They do not dictate the conclusion, and a court need not find the presence of all three factors in concluding that a transaction is a

loan.  *See, e.g.*, *LG Funding*, 122 N.Y.S.3d at 312–13 (affirming denial of motion to dismiss affirmative defenses alleging that the transaction was a criminally usurious loan without considering whether the agreement had a finite term); *Davis v. Richmond Cap. Grp., LLC*, 150 N.Y.S.3d 2, at 4 (1st Dep't 2021) (concluding that plaintiffs sufficiently alleged that agreements were loans subject to usury laws and reciting characteristics of agreement relating to reconciliation and recourse but not finite term of agreement); *Advance Servs. Grp. v. Acadian Props. Austin LLC*, 141 N.Y.S.3d 834, at *5 (Sup. Ct. Kings Cnty. 2021) (concluding that repayment was absolute and therefore agreement was a loan notwithstanding the lack of a finite term in the agreement); *Pirs Cap., LLC v. D&M Truck, Tire & Trailer Repair Inc.*, 129 N.Y.S.3d 734, 74 (Sup. Ct. N.Y. Cnty. 2020) (concluding that, notwithstanding a recourse provision in an agreement, "the other aspects of the transaction render the [a]greement . . . 'sufficiently risky such that they cannot be considered loans, as a matter of law'" where those other aspects included a reconciliation provision and a non-finite repayment term (quoting *K9 Bytes, Inc.*, 57 N.Y.S.3d at 633 (Sup. Ct. Westchester Cnty. 2017)).  Rather, the essential question under New York law is whether the contracting party "is absolutely entitled to repayment under all circumstances."  *LG Funding*, 122 N.Y.S.3d at 312 (quoting *K9 Bytes, Inc.*, 57 N.Y.S.3d at 632).  Thus, an agreement can be a loan notwithstanding the presence of a reconciliation provision and a non-finite term.  *See Legend Advance Funding II, LLC v. Almeida's Auto Repair, Inc.*, 2022 WL 885718, at *2–3 (Sup. Ct. N.Y. Cnty. Mar. 24, 2022) (denying summary judgment to putative lender where an agreement included a reconciliation provision and was for a non-finite term but where the "plaintiff has multiple means of recourse if merchant declares bankruptcy").

The Second and Fifth Circuits engage in a similar analysis to distinguish a true sale from a transfer of collateral in connection with a secured financing.  In both Circuits, the

characterization turns upon "the substance of the transaction," and not on the label attached to it by the parties. *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1068–69 (2d Cir. 1995); *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.,* 336 F.3d 410, 414 (5th Cir. 2003) ("Characterization of the agreement at issue turns on 'the substance of the relationship . . . not simply the label attached to the transaction . . . .'" (quoting *Endico Potatoes*, 67 F.3d at 1068)); *In re R&J Pizza Corp.*, 2014 WL 12973408 at *3 (Bankr. E.D.N.Y. Oct. 14, 2014) ("[T]he case law focuses on the economics of the transaction and which party bears the risk of non-collection from the account debtor in determining whether a sale of accounts is a true sale or a secured transaction. While the terminology and characterization of the transaction in the agreement itself is a factor to be considered, it is not conclusive." (citation omitted)). The courts applying *Endico Potatoes* consider a number of factors including:

> the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces the debt.

*Endico Potatoes*, 67 F.3d at 1068; *see also Sotheby's Inc. v. Minor*, 2010 WL 11601336, at *9 (S.D.N.Y. Mar. 30, 2010) (reciting *Endico Potatoes* factors in analyzing breach of contract claim and explaining that "the root of all of these factors is the transfer of risk"). The ultimate question, like that in *LG Funding*, relates to whether the transaction involves a transfer of risk. Where the putative "lender and not the [putative] borrower bears the risk of non-performance by the account debtor" and "the borrower's debt is extinguished" by the transaction, then "the lender's risk with regard to the performance of the accounts is direct," and the transaction is properly characterized as the purchase of accounts receivable. *Endico Potatoes*, 67 F.3d at 1069. By contrast, the transaction is properly characterized as a loan where "the lender holds only a security interest [and] the lender's risk is derivative or secondary, that is, the borrower remains

liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan." *Id.*; *see also Adar Bays, LLC*, 179 N.E.3d at 622 ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders, not investors.").

Whether the Court looks to the *LG Funding* or *Endico Potatoes* factors, the result here is the same. Reading the agreement in its totality and by its real character, it constitutes a loan and not a sale of assets. The lender "is absolutely entitled to repayment [by Fleetwod] under all circumstances," *LG Funding*, 122 N.Y.S.3d at 312 (quoting *K9 Bytes, Inc.*, 57 N.Y.S.3d at 632), and it is the borrower—and not the lender—who bears the risk of the account debtor's non-payment. On the most elementary level, the Agreement places the obligation on Fleetwood and not on any account debtor to repay Richmond and sets that sum not as a percentage of the receipts from account debtors but as an absolute figure of "the specific daily amount" of $1,399 "each business day," regardless of whether any accounts receivable are collectible or not. *Id.* Thus, Fleetwood, not the account debtors, assumes responsibility "for ensuring that the specified percentage to be debited . . . remains in the Account." *Id.* The Designated Account is to be the "<u>only one</u> depositing bank account." *Id.* And if Fleetwood fails in its obligation to ensure that the "specified percentage to be debited remains in the account," then Richmond is entitled to remedies against *Fleetwood* and not against the account debtors. Among other things, if the Designated Account does not have sufficient funds to cover the withdrawals of the daily amount more than four times, a default is declared, *id.* at ECF p. 7, the full uncollected Purchased Amount becoming immediately due and payable, and Richmond has the right to pursue all remedies provided for in the Agreement against Fleetwood and the guarantors, *id.* § 1.11.

Although on its face the Agreement purports to provide for the sale of accounts receivables, that is just window dressing.  The Agreement has none of the characteristics of the sale of receivables in terms of the transfer of risk and rewards.  The Fleetwood Agreement provides that Fleetwood "sells, assigns and transfers" not just its accounts receivable but "all of [its] *future accounts, contract rights and other entitlements arising from or relating to* the payment of monies from Merchants' customers and/or third party payors . . . for the payments due to Merchant as a result of Merchant's sale of goods or services" until the total "Purchased Amount" is repaid.  Dkt. No. 77-1 at 1.  That language is so broad as to be essentially vacuous.  It captures not just future accounts from Fleetwood's customers but gives Richmond the right to *all* Fleetwood revenues up to the full uncollected Purchased Amount.  It covers all contract rights and other entitlements as long as those entitlements relate to the payment of monies from any third-party payors related to the sale of goods *or* services.  Tellingly, Defendants do not identify any revenue that Fleetwood, or any operating business, could receive that would not somehow be captured by this broad language, and it is difficult to imagine what revenue would not fall within it.

Furthermore, the rights and risks that Richmond obtains do not bear any resemblance to the purchase of assets.  Richmond itself has no obligation, or (ordinarily no) right, to collect on the "receivables."  That obligation rests entirely on Fleetwood, and Fleetwood is required to remit the specified percentage into the Designated Account, regardless whether the "Merchant's customers" are able to do so.  Richmond has no responsibility to contact Fleetwood's customers; indeed, it is given the right to collect directly from them only in the event of a default.  Dkt. No. 77-1 § 1.10.  The risk of non-payment thus falls entirely on Fleetwood.  The failure of an account debtor has no consequence on the amount due.  If a Fleetwood account debtor failed to pay its

debt or became insolvent, there would be no reduction in the Purchased Amount or on

Fleetwood's obligations to pay the daily amount; Richmond would be repaid from the proceeds

of any other Transaction.  *Cf. Funding Metrics, LLC v. NRO Bos., LLC*, 2019 WL 4376780, at *4

(Sup. Ct. N.Y. Cnty. Aug. 28, 2019) ("Denominating loan documents by another name, such as

'Merchant Agreements' as in this case, and including in such documents language of [the

putative lender's purported purchase of account receivables that is unsupported by actual

[borrower] receivables dedicated to repayment, does not shield it from the judicial determination

that it contemplates a criminally usurious transaction, which is void *ab initio* as a matter of

law.").

Richmond also does not receive the reward of performance by the account debtors.

Under the Agreement, it is entitled to only the Purchased Amount, and not more.  Fleetwood has

use of the Designated Account, and Richmond's right to draw from it is extinguished at "such

time as [Richmond] receives payment in full of the Purchased Amount."  Dkt No. 77-1 at 1.

Thus, even if the account debtors perform better than expected, Richmond's recovery is capped,

and it will receive no benefit from that performance.  Indeed, so long as Fleetwood has enough

money to cover the daily payment amount in the Designated Account, Fleetwood can use the

proceeds from Transactions however it likes—the receipts need not be deposited in an escrow

account or otherwise held in trust for Richmond's benefit.  Fleetwood enjoys the use of the

proceeds.  Richmond has none of the rights of ownership—it does not have the right to possess,

use, or convey any of the accounts it supposedly has purchased.  *See* Black's Law Dictionary

(11th ed. 2019) (defining ownership as "[t]he bundle of rights allowing one to use, manage, and

enjoy property, including the right to covey it to others. . . . Ownership rights are general,

permanent, and heritable."); *Handelman v. Comm'r Internal Revenue*, 509 F.2d 1067, 1071 (2d

Cir. 1975) (referring to "the greater bundle of rights and attributes of ownership" as "including title, possession and management, and the burdens and benefits accompanying same" (internal quotation marks omitted)).

Under the Agreement, Fleetwood and Pamela and Robert Fleetwood, as guarantors, have the obligation to conduct due diligence and credit checks on the customers whose accounts Richmond supposedly has purchased; Richmond does not.  The Agreement gives Richmond itself neither the obligation nor the right, absent a default, to collect on the accounts.  Fleetwood and the guarantors:

> agree[d], warrant[ed] and represent[ed] … that they w[ould] constantly perform all appropriate Due Diligence and credit checks of all of the customers' finance, cash flow, solvency, good faith, payment histories, and business reputations (the 'Due Diligence Requirements') as may suffice to ensure any and all products and/or services provided sold or delivered by [Fleetwood] to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account.

Dkt. No. 77-1 § 2.14.

Fleetwood is obligated to "expend its Best Efforts to maintain and to grow its business, to ensure that [Richmond] obtains the full Purchased Amount," and a breach of that obligation constitutes a default giving rise to the full remedies against both Fleetwood and the guarantors. Dkt. No. 77-4 § 2.14.  And significantly, Fleetwood, as the "Merchant," agreed that, if it interrupts the operation of the business, or transfers, moves, sells, disposes, or otherwise conveys its business or assets without Richmond's express written consent, the "full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately."  *Id.* § 1.11.

Richmond is entitled to repayment in full from Fleetwood in virtually every imaginable circumstance.  The Agreement contains provisions that provide recourse for Richmond against Fleetwood and its guarantors in the case of Fleetwood declaring bankruptcy.  In the Fleetwood

Agreement, Fleetwood's written admission of its inability to pay debts or its bankruptcy or

insolvency each constitutes an "Event of Default," pursuant to which Richmond

> may proceed to protect and enforce its rights or remedies by suit in equity or by
> action at law or both . . . or to enforce the discharge of Merchant's obligations
> hereunder (including the Guaranty) or any other legal or equitable right or remedy.
> All rights, powers and remedies of [Richmond] in connection with this Agreement
> may be exercised at any time by [Richmond] after the occurrence of an Event of
> Default . . . and shall be in addition to any other rights, powers or remedies provided
> by law or equity.

Dkt. No. 77-1 § 3.3.  The Agreement also provides that "[i]n the event that the Merchant files for

bankruptcy protection or is placed under an involuntary filing Protections 2 and 3 are

immediately invoked."  *Id.* § 2.9.  Protection 2 allows Richmond to "enforce the provisions of

the Personal Guaranty of Performance against the Guarantor," while under Protection 3,

Fleetwood authorized Richmond to execute in the name of Fleetwood a confession of judgment

in favor of Richmond "in the amount of the Purchase Amount stated in the Agreement."  *Id.*

§ 1.11.[6]  As in *LG Funding*, if Fleetwood files for bankruptcy, Richmond would be entitled to

repayment of the full Purchase Amount—not just the amount that it paid upfront—through a

court-filed confession of judgment, suggesting that the agreement is a loan.  *See Advance Servs.*

*Grp.*, 141 N.Y.S.3d at *5 ("Finally, paragraphs 2.9 and 1.11 of the Merchant Agreement provide

that if Acadian files for bankruptcy or is placed under an involuntary filing, Advance is

immediately entitled to enforce the personal guaranties and enter a confession of judgment

against Acadian.  These provisions reflect that bankruptcy is a default under the Merchant

Agreement, entitling Advance to an immediate judgment against Acadian.  Thus, Advance

---

[6] Protection 3 states that "[u]pon breach of any provision in this paragraph 1.11, [Richmond] may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon," *id.*, but in order for Section 2.9's reference to Protection 3 to have any meaning, it must be interpreted to mean that Richmond can enter with a court the confession of judgment that was previously authorized upon filing for bankruptcy protection.

did *not* assume the risk that Acadian would have no future receivables and repayment was absolute, not contingent, and weighs in favor of treating this transaction as a loan rather than a purchase of receivables.").

The guaranty signed by Pamela and Robert Fleetwood guarantees Fleetwood's performance of "all representations, warranties, covenants made by Merchant in the [Fleetwood] Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9 [relating to bankruptcy], 2.10, 2.11, 2.12, 2.13, 2.14" and provides that "Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement." *Id.* at ECF p. 4. Those representations, warranties, and covenants include the obligation to remit the specified percentage into the Designated Account. If Fleetwood fails to satisfy that covenant, Richmond is entitled to seek recovery from the guarantors for all "losses and damages by enforcement of [Richmond's] rights under th[e] Agreement," including the right to the full Purchased Amount. *Id.* at ECF p. 4. Upon the occurrence of an "Event of Default" listed in Section 3.1—including if Fleetwood is unable to pay its debts or its files for bankruptcy—Richmond may "enforce the discharge of Merchant's obligations hereunder (including the Guaranty)." Dkt. No. 77-1 § 3.3. Courts have observed that personal guarantees are "consideration[s] pointing toward treating the agreement being treated as a loan rather than a receivables purchase" but have also observed that personal guarantees that are limited by the contingent nature of the merchant's obligations under an agreement may not render the agreement a loan. *Pirs Cap., LLC*, 129 N.Y.S.3d at 740; *see also OriginClear Inc. v. GTR Source, LLC*, 2021 WL 5907878, at *6 (W.D.N.Y. Dec. 14, 2021). Here, the Guaranty is tied to the merchant's obligations under the Agreement, but those obligations are not contingent upon the receipt of future receivables—if Fleetwood declared

bankruptcy, it would be subject to a confession of judgment for the full Purchase Amount of $149,900.00.  *See* Dkt. No. 77-4 § 1.11.

Thus, under the Agreement, there are virtually no circumstances where, if the accounts receivable would not be sufficient to pay the Purchased Amounts, Richmond would not be absolutely entitled to repayment of that amount by Fleetwood.  "Beyond the superficial hazard associated with a [merchant's] relatively meager chance of success, [Richmond] backed up the risk with [a] personal guarantee and a security interest in [Fleetwood's] property.  Moreover, any default of the Agreements (including [Fleetwood's] closing or bankruptcy) would trigger payment."  *Clever Ideas, Inc. v. 999 Rest. Corp.*, 2007 WL 3234747 (Sup. Ct. N.Y. Cnty. Oct. 12, 2007).

The Fleetwood Agreement nominally has a reconciliation provision, Dkt. No. 77-1 at 1 ("RCF *will* debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements on or about the eighteenth day of each month *reconcile the Merchant's Account* by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the specified percentage" (emphasis added)).  But that provision functions in such a way that renders it largely illusory.  It does not relieve Fleetwood of the obligation, if the merchants do not pay the specific daily amount, for Fleetwood to pay the specific daily amount, nor does it qualify the right of Richmond, if the specific daily amount is not paid for four days, to declare the full Purchased Amount immediately due and payable and to exercise its rights to collect as against Fleetwood.

The reconciliation provision provides that it will "upon receipt of the Merchant's monthly bank statements on or about the eighteenth day of each month reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the

amount debited per month equals the specified percentage." *Id.*  Notably, the provision does not provide that the daily amount would change upon reconciliation—indeed, the only way the specific daily amount would actually change would be if Richmond "upon Merchant's request, adjust[ed] the amount of any payment due under this Agreement at [its] *sole discretion and as it deems appropriate.*" *Id.; see also Am. Water Restoration, Inc. v. AKF Inc.*, 157 N.Y.S.3d 919, at *4 (Sup. Ct. Ontario Cnty. 2002) (concluding usurious loan contention was negated where reconciliation provision required adjustment of daily amount debited after reconciliation "to more closely reflect the Merchant's actual Receipts times the Specified Percentage").  Thus, as Richmond itself made clear in its communications to Fleetwood and to its other debtors, *see supra* at p. 10, it had the right to decline a request by a debtor to reduce the amount that needed to be deposited into the designated account even if the debtor did not have sufficient funds to deposit into the account, *see, e.g.*, Dkt. No. 77-6; Dkt. No. 79 ¶¶ 70–72 (citing to affidavits of Richmond's customers that Richmond refused to reduce the daily payments of merchants when the merchant's receivable collections slowed down").  Even if the business was not performing and a reconciliation would show that the daily amount Richmond was deducting from Fleetwood's account was far above the specified percentage of Transactions to which it was entitled, Fleetwood would continue to be charged that daily amount each day regardless of the result of that reconciliation absent Richmond's unilateral decision to reduce the amount.  If the merchant is unable to pay that daily amount for more than four days, the merchant would be in default pursuant to the language in Appendix A.[7]  Since a "default under any of the terms,

---

[7] A simple example illustrates the point.  Suppose, for example, that Fleetwood's receipts from defined Transactions equaled $1,300 per day, Richmond still would have the right to withdraw $1,399 per day.  The deficit between what Fleetwood received from defined Transactions and the Specified Percentage would not affect Richmond's right on a daily basis to withdraw $1,399.  Richmond would have the obligation, on the 18th of the month, to credit Fleetwood back the

covenants, and conditions of any other agreement with RCF" is an "Event of Default" under the

Fleetwood Agreement, Richmond would be entitled to 100% of the amounts due from each

Transaction, *see* Dkt. No. 77-1 at 1, in addition to "[a]ll rights, powers, and remedies of RCF in

connection with th[e] Agreement, *id.* § 3.3.  Among the "rights, powers, and remedies" granted

to RCF in connection with the Fleetwood Agreement are: (1) the "full uncollected Purchase

Amount plus all fees (including legal fees) due under the[s] Agreement and the attached Security

Agreement becom[ing] due and payable in full immediate," *id.* § 1.11 (Protection 1); (2)

"enforc[ing] the provisions of the Personal Guaranty of Performance against the Guarantor(s),"

*id.* (Protection 2); (3) entering a confession in favor of RCF in the amount of the full Purchase

Amount with the clerk of any court, *id.* (Protection 3); (4) the "entire Purchase Amount and all

fees (including legal fees) . . . becom[ing] immediately refundable and payable to RCF from

Merchant," *id.* (Protection 5); and (5) "proceed[ing] to protect and enforce its rights or remedies

by suit in equity or by action at law, or both . . . to enforce the discharge of Merchant's

obligations hereunder (including the Guaranty)," *id.* § 3.3.

Viewing the Agreement as a whole, the Court concludes that it is a loan and not a

contract for the purchase of future receivables.  It thus may be subject to usury laws.  *LG*

*Funding*, 122 N.Y.S.3d at 312 ("The rudimentary element of usury is the existence of a loan or

forbearance of money, and where there is no loan, there can be no usury, however

unconscionable the contract may be.").

---

difference between $1,399 and 10% of the $1,300 (or $130).  But Fleetwood's right to the credit
would be illusory.  If the $1,300 it received on a daily basis was insufficient for Richmond to
withdraw $1,399 on a daily basis for a four-day period, Richmond could declare an Event of
Default and Richmond would owe the full Purchase Amount.  Fleetwood would never reach the
18th day of the month.  That is exactly the point that Richmond made in its correspondence with
its merchant customers.  It could declare them in default and obtain the full Purchase Amount
regardless of the performance of the accounts.

## II.     Usury Claim

Plaintiff seeks summary judgment for its third cause of action, which is for usury in

violation of the Texas Finance Code, and its fourth cause of action, for associated attorneys' fees.

The essential elements of a usury claim under Texas law are: "(1) a loan of money; (2) an

absolute obligation to repay the principal; and (3) the extraction of a greater compensation than

allowed by law for the use of the money by the borrower." *First Bank v. Tony's Tortilla*

*Factory, Inc.*, 877 S.W.2d 285, 287 (Tex. 1994).  Under Texas law, the maximum interest rate

"[f]or a contract made, extended, or renewed under which credit is extended for a business,

commercial, investment, or similar purpose" is 28% per year.  Tex. Fin. Code § 303.009(c).

Under Section 305.003 of the Texas Finance Code, "[a] creditor who charges or receives legal

interest that is greater than the amount authorized" is liable to the borrower for "an amount that

is equal to . . . three times the difference between the maximum allowable legal interest and the

total amount of interest charged." *Id.* § 305.003.  If the interest charged and collected is more

than twice the legal maximum, then, in addition to any amounts due under Section 305.003, the

creditor is entitled to "(1) the principal amount on which the interest is charged and received; and

(2) the interest and all other amounts charged and received" by the creditor.  *See* Tex. Fin. Code

§ 305.004(a).

Plaintiff argues that, on its face, the Agreement charged a nominal interest rate of 99.8%

per year, but, considering the excess withdrawals, the nominal interest rate was actually 278.5%

per year.  Dkt. No. 76 at 35.  In support of these figures, Plaintiff submits an expert report of a

Charles S. Lunden, a "Certified Public Accountant with more than forty years of experience

assessing damages," *id.*, who calculated these figures, Dkt. No. 78-19 at ECF p. 9.

A.      Choice-of-Law

The preliminary gating question is whether Texas law applies.  The Fleetwood Agreement has a choice-of-law provision stating that the "Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principles of conflicts of law."  Dkt No. 77-1 § 4.5.  Plaintiff argues that the choice-of-law provision governs only the construction of the Fleetwood Agreement and not extra-contractual causes of action such as usury.  Dkt. No. 76 at 18.  Defendants assert that New York law applies, arguing that the law chosen by the parties is relevant and explaining that "New York has a superior interest in resolving the matters at issue herein, as the Defendants reside in the metropolitan area, did business in the NY metropolitan area, bank in the NY metropolitan area, and most importantly . . . ., have been successfully defending multiple governmental agencies [sic] within the NY metropolitan area."  Dkt. No. 80 at ECF p. 8.

"In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state."  *Manning Int'l Inc. v. Home Shopping Network, Inc.*, 152 F. Supp. 2d 432, 436 n.3 (S.D.N.Y. 2001) (citing *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989)).  Moreover, the validity of a contractual choice-of-law provision is "decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses."  *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332, 335 (2d Cir. 2005).  "Under New York law, great deference is to be given a contract's designation of the law that is to govern disputes arising from the contract, and that designation is determinative if the state selected has sufficient contacts with the transaction."  *Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir. 1984); *see also Int'l Bus. Machines Corp. v. Mueller*, 2017 WL 4326114, at *4 (S.D.N.Y. 2017) (same).

If a claim falls within a contract's choice-of-law provision and the provision calls for New York law, New York law will generally be applied "so long as the chosen law bears a reasonable relationship to the parties or the transaction," but it will not be applied "where the chosen law 'violates some fundamental principles of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.'"  *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500–01 (N.Y. 2006); *see also United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020) ("'New York law is unambiguous in the area of express choice of law provisions in a contract.  Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction.'" (quoting *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996)); *Medtronic, Inc. v. Walland*, 2021 WL 4131657, at *4–6 (S.D.N.Y. Sept. 10, 2022) (explaining that, even after the New York Court of Appeal's decision in *Ministers & Missionaries Benefit Bd. v. Snow*, 45 N.E.3d 917 (N.Y. 2015)—which stated that "New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract"—a court should consider whether a choice-of-law provision bears a reasonable relationship to the parties or transaction or violates a fundamental policy of a state with a materially greater interest than the chosen state).  The rule protects the justified expectations of the parties to an agreement and honors the principle that "persons are free within broad limits to determine the nature of their contractual obligations" and "the demands of certainty, predictability and convenience," while at the same time preventing parties from opting into the law of a particular state that has no reasonable relationship to the parties or the transaction simply because the law is convenient.  *See* Restatement (Second) Conflict of Laws § 187 comment e.

The application of a choice-of-law provision to a usury claim can make a material

difference to the success or failure of that claim.  Assuming that the usury claim falls within the

scope of the choice-of-law provision, the parties' choice of law is respected and will be enforced

unless the chosen law bears no reasonable relationship to the transaction or the parties or if

enforcement of it would be intolerable for the court.  By contrast, in the absence of a choice-of-

law provision, New York applies a "center of gravity" approach to contract cases, *Moseley*, 980

F.3d at 23, and an interest analysis to tort cases, *Toretto v. Donnelley Fin. Solutions, Inc.*, --- F.

Supp. 3d ---, 2022 WL 348412, at *5 (Feb. 4, 2022).  The center of gravity approach focuses on

the place with "the most significant contacts with the matter in dispute," looking to "five

generally significant contacts: the places of contracting, negotiation and performance; the

location of the subject matter of the contract; and the domicile of the contracting parties."

*Moseley*, 980 F.3d at 23 (internal quotation marks and citations omitted) (alterations adopted)

(analyzing which state's usury laws would apply under "center of gravity" approach); *see also A.*

*Conner Gen. Contracting Inc. v. Rols Cap. Co.*, 535 N.Y.S.2d 420, 421 (2d Dep't 1988).  In this

approach, "public policy considerations . . . may also bear on the analysis in cases 'where the

policies underlying conflicting laws in a contract dispute . . . reflect strong governmental

interests." *Id.* (quoting *In re Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936 (N.Y. 1993)).  In tort

cases, the "'law of the jurisdiction having the greatest interest in the litigation [will] be applied.'"

*Krock v. Lipsay*, 97 F.3d 640, 645–46 (2d Cir. 1996) (alterations adopted) (quoting *Kalb,*

*Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993)).  For the purposes of the

interest analysis, "the facts or contacts which obtain significance in defining State interests are

those which relate to the purpose of the particular law in conflict." *Miller v. Miller*, 237 N.E.2d

877, 879 (N.Y. 1968).  Factors to be considered in applying the interest analysis include "[t]he

contacts of the parties and occurrences with each jurisdiction . . .[,] the policies underlying each jurisdiction's rules, the strength of the governmental interests embodied in these policies, and the extent to which these interests are implicated by the contacts." *Fin. One Pub. Co.*, 414 F.3d at 337.  Moreover, the interest analysis approach looks to whether the law under consideration is "conduct-regulating" rather than "loss-allocating," where "[c]onduct-regulating rules have the prophylactic effect of governing conduct to prevent injuries from occurring," while "[l]oss allocating rules . . . prohibit, assign, or limit liability after the tort occurs." *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1003 (N.Y. 1994); *see also In re Thelen LLP*, 736 F.3d 213, 220 (2d Cir.), *certified question accepted sub nom. Thelen LLP. v. Seyfarth Shaw LLP*, 4 N.E.3d 359 (N.Y. 2013), and *certified question answered*, 20 N.E.3d 264 (N.Y. 2014) (internal quotation marks and citations omitted).

The threshold question is thus whether or not Plaintiff's usury claim may fall within the choice-of-law provision in the Agreement.  "'[T]he effect of a choice-of-law clause depends on its scope,' and New York courts are 'reluctant to read choice-of-law clauses broadly.'" *Arnone v. Aetna Life Ins. Co.*, 860 F.3d 97, 108 (2d Cir. 2017) (alterations adopted) (quoting *Fin. One Pub. Co.*, 414 F.3d at 332, 335).  Specifically, there is "a reluctance on the part of New York courts to construe contractual choice-of-law clauses broadly to encompass extra-contractual causes of action." *Fin. One Public Co.*, 414 F.3d at 334.  Thus, "New York courts typically apply the law selected in contractual choice-of-law clauses only to causes of action sounding in contract unless 'the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties.'" *EMA Fin., LLC v. NRusz, Inc.*, 444 F. Supp. 3d 530, 540 (S.D.N.Y. 2020) (quoting *H.S.W. Enter. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 141 (S.D.N.Y. 2001)).

The law is not completely settled in the Second Circuit whether a usury claim falls within a "narrow" choice of law provision. The Second Circuit has observed that a choice-of-law provision that states "[t]his Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)" is "not broad enough to reach tort claims incident to the contractual relationship," *Fin. One Pub. Co.*, 414 F.3d at 335 (citing *Knieriemen v. Bache Halsey Stuart Shields Inc.*, 427 N.Y.S.2d 10, 12–13 (1st Dep't 1980)), or to reach other non-contractual causes of action, *see Mayagüez S.A. v. Citigroup, Inc.*, 2018 WL 1587597, at *7 (S.D.N.Y. Mar. 28, 2018). Such language "merely specif[ies] the law that applies to claims *arising from the* contract but not to non-contractual claims (*e.g.*, consumer protection statutes sounding in fraud)." *Heskiaoff v. Sling Media, Inc.*, 719 F. App'x 28, 31 (2d Cir. 2017) (summary order). Thus, "language in a choice-of-law provision indicating that the *contract* will be governed by a certain body of law is insufficient to determine which law will govern *tort claims arising out of* that contract." *Bausch & Lomb Inc. v. Mimetogen Pharms., Inc.*, 2016 WL 2622013, at *8 (W.D.N.Y. May 5, 2016). Extra-contractual claims will not fall within the scope of a narrow choice-of-law provision "even where the rights at issue are closely related to contractual rights and obligations." *Mayagüez S.A.*, 2018 WL 1587597, at *7.

A narrow choice-of-law provision has been held insufficient to cover tort claims such as fraudulent conveyance claims, *Ramiro Aviles v. S&P Glob., Inc.*, 380 F. Supp. 3d 221, 271 (S.D.N.Y. 2019), fraudulent misrepresentation claims, *Krock*, 97 F.3d at 645, fraudulent inducement claims, fraudulent concealment claims, negligent misrepresentation claims, *Mayagüez S.A.*, 2018 WL 1587597, at *7, and tortious interference claims even if they arise in connection with a contract, *Manbro Energy Corp. v. Chatterjee Advisors, LLC*, 2021 WL 2037552, at *3 (S.D.N.Y. May 21, 2021). It also does not cover claims that are non-contractual

in nature like promissory estoppel and unjust enrichment claims. *Mayagüez S.A.*, 2018 WL 1587597, at *7. "[I]n order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." *Krock* , 97 F.3d at 645 (quoting *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309–10 (2d Cir. 1994)).

Claims that a contract is unconscionable, on the other hand, have been found to sound in contract and thus to fall within a narrow choice-of-law provision. *See, e.g.*, *Mayagüez S.A.*, 2018 WL 1587597, at *10 ("Because Mayagüez's unconscionability claim is a contract-based claim, it is subject to the choice of law provision in the [agreement].");  *Wework Companies Inc. v. Zoumer*, 2016 WL 1337280, at *5 (S.D.N.Y. April 5, 2016) (applying New York law to unconscionability claim where choice-of-law provision was narrow).[8]

---

[8] Courts outside the Second Circuit appear to be split on whether usury claims are contractual. *Compare Hengle v. Asner*, 433 F. Supp.3d 825, 864 (E.D. Va. 2020) (applying Virginia's choice-of-law rules to usury claim and, in so doing, noting that "courts considering *contract-related* claims will give a choice-of-law provision in a contract the fullest effect intended by the parties absent unusual circumstances" (emphasis added)); *with BREA 3-2 LLC v. Hagshama Florida 8 Sarasota, LLC*, 327 So.3d 926, 935 n.6 (Ct. App. Fl. 3d Dist. 2021) (analyzing usury claim as tort claim in determining whether it fell within the scope of an arbitration provision); *Sake TN, LLC v. Cain*, 2022 WL 525993, at *8–9 (M.D. Tenn. Feb. 22, 2022) (observing that usury is a cause of action that lies in both tort and contract and finding allegations of violations of state usury statute sufficient to adequately allege an underlying tort to support conspiracy claim). A few decisions have treated usury claims as non-contractual and falling outside a narrow choice-of-law provision. *See, e.g.*, *Clark v. Advanceme, Inc.*, 2009 WL 10672598, at *3 (C.D. Cal. 2009) (holding New York law was not applicable to plaintiffs' usury claims where contractual choice-of-law provision read that the agreement "shall be governed by, and construed in accordance with, the internal laws of the State of New York" because of persuasive authority "that a usury claim is non-contractual"); *Essex Partners Ltd. v. Merchant Cash & Cap.*, 2011 WL 13123326, at *3–4 (C.D. Cal. Aug. 1, 2011) (citing cases that hold that usury claims are non-contractual, including *Clark*, and thus fall outside of contract's New York choice-of-law clause and concluding the same).

Courts have opined that "the right to recover usurious interest is not predicated upon the written contract . . . under which the usury was paid, but rather on a duty imposed by law to repay an unjust and unmerited enrichment. The liability based upon an obligation of this kind arises purely upon an implication of law, independent of the agreement or intention of the

The foregoing cases beg the question, rather than answering it, whether a usury claim should be considered to be contractual for purposes of choice-of-law. Although the answer is not free from doubt, it appears that the approach that is most consistent with Second Circuit law is to treat usury claims as contractual for purposes of choice-of-law analysis and to give effect to the parties' choice of the law that they desire to apply to the enforceability of the interest provision of a contract as long as that law has a reasonable relationship to the transaction and/or the parties and is not against public policy. In particular, in *United States v. Moseley*, the Second Circuit considered a relatively broad choice-of-law provision that stated that the law of a jurisdiction "shall control the rights, duties, and obligations of the parties hetero without regard to [the jurisdiction's] choice of law provisions." 980 F.3d at 19 (internal quotation marks omitted). While not considering the breadth of the choice-of-law provision, the Circuit apparently agreed that a usury claim would fall within it and proceeded to analyze whether the choice-of-law provision would otherwise be effective in light of New York's public policy in favor of enforcing its usury laws to protect its residents. *Id.* at 20–22. After concluding that the choice-of-law provision would not be effective because "provisions specifying foreign jurisdictions without usury laws are unenforceable in New York as against its public policy," *id.* at 22, the

---

parties." *Miller v. York*, 548 P.2d 941, 945 (Nev. 1976); *see also Clark*, 2009 WL 10672598, at *3 n.5 (citing *Miller* and stating that, while it is not "directly on point," "its reasoning is instructive and consistent with [p]laintiffs' contention that a usury claim is non-contractual"). In that view, the violation would pertain to a duty "imposed by law in recognition of public policy and is generally owed to others besides the contracting party" and does not "emanate from a[] duty created by the parties' unique contractual relationship." *BREA 3-2 LLC*, 327 So.3d at 935 (internal quotation marks omitted); *see also Dunn v. Global Trust Mgmt., LLC*, 506 F.Supp.3d 1214, 1222 (M.D. Fl. 2020). Under this theory, because it arises from a duty other than one that is imposed by contract, Plaintiffs' usury claim would not fall within the narrow choice-of-law provision agreed by the parties pursuant to the contract. *See Travelers Ins. Co. v. Sequa Corp.*, 2014 WL 12812403, at *2 (S.D.N.Y. Mar. 10, 2014) ("Where the claim requires 'the interpretation and enforcement of the rights and duties of the parties' under the contract . . . it falls within the law agreed upon by the parties pursuant to the contract.").

Circuit applied the "center of gravity" approach that is applicable to "adjudicating the choice of law for a contract dispute," *id.* at 23.

The Circuit's use of the "center of gravity" approach to choice-of-law issues, rather than the "interest analysis" advocated for by Fleetwood and applicable to tort claims, suggests at least an implicit conclusion that usury claims sound in contract and not in tort. *Cf. Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001) (applying "center of gravity" analysis to determine "which state has the most significant relationship to the transaction and the parties" to claim that "sounds more in contract than in tort"); *Fin. One Pub. Co.*, 414 F.3d at 336 (analyzing whether a claim fit within a narrow choice-of-law provision separately from whether the "center of gravity" choice-of-law approach applicable to contract claims or the "interest analysis" approach applied but ultimately concluding that the claim both fell outside the choice-of-law provision and was better suited to using an "interest analysis" approach).

New York courts, as well as courts within the Second Circuit, have similarly applied the "center of gravity" approach to cases involving usury, suggesting that usury is a contract-based claim. In *A. Conner General Contracting Inc.*, the Appellate Division appeared to conflate the "center of gravity" approach and the interest analysis, explaining that:

> New York's present choice-of-law rule, dubbed the center of gravity approach is that the law of the state having the most significant contacts with the matter in dispute will be applied, even where the matter in dispute is usury. . . . [T]he Court of Appeals has not articulated a special rule for usury cases. Rather, it appears to remain that "the law of the jurisdiction having the greatest interest in the litigation will be applied and that the facts or contracts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."

535 N.Y.S.2d at 422 (quoting *Miller*, 237 N.E.2d at 879). But courts following *A. Conner*—both state and federal—have cited that case as holding that the "center of gravity" approach should apply. *See Indus. Dev. Bank of Isr. Ltd. v. Bier*, 565 N.Y.S.2d 980, 984 (Sup. Ct. N.Y. Cnty. 1991) (citing *A. Conner* in considering whether a loan agreement that allegedly contained a

usurious interest rate should be enforced and holding that, because "agreements and guarantees were entered into Israel, the parties all resided in Israel at the time, and performance was to take place there . . . [Israel] has the most substantial relationship to these transactions, and it is the law of that country which should be applied"); *Am. Equities Grp. v. Ahava Dairy Prods. Corp.*, 2004 WL 870260, at *9 (S.D.N.Y. Apr. 23 2004) (applying New York law "[b]ecause New York is the state with the most significant contacts to the parties in the context of the Agreement"); *Am. Exp. Travel Related Servs. Co. v. Assih*, 893 N.Y.S.2d 438, 447 (Civ. Ct. Richmond Cnty. 2009) (concluding "that New York has the most significant contacts to the parties and New York law will apply to the Agreement in reference to whether or not the interest being charged is usurious"); *cf. Leasing Serv. Corp. v. Graham*, 646 F. Supp. 1410, 1417 (S.D.N.Y. 1986) (applying "most significant contacts" test to determine whether conflicting Texas or New York usury law should be applied to agreements).  And courts in this Circuit have treated the affirmative defense of usury as a claim as falling within a narrow contractual choice-of-law provision, even though they have done so without expressly analyzing whether the scope of the contractual provision includes such claims, instead appearing to assume that it does.  *See, e.g.*, *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 147–48 (S.D.N.Y. 2017) (declining to apply Delaware choice-of-law provision because applying Delaware usury law would violate a fundamental public policy of New York); *Power Up Lending Grp. v. Alliance Bioenergy Plus, Inc.*, 2019 WL 1322621, at *3–4 (declining to ignore choice-of-law provision to allow for defense based on New York usury law on public policy grounds); *EMA Fin.*, 444 F. Supp. 3d at 540 (applying usury law of state provided for in choice-of-law provision).  It thus follows that, at

least for choice-of-law purposes, a usury claim is considered to be contractual and to be encompassed by a narrow choice-of-law provision.[9]

This approach is similar to that which the Restatement (Second) of Conflict of Laws takes to usury claims.  The Restatement permits parties to agree by contract to the law that will govern whether the interest rate in a contract is usurious out of respect for the principles of freedom of contract and on the general view that, oftentimes and as with New York and Texas law, "the permissible rate of interest will vary only slightly from state to state."  Restatement (Second) of Conflict of Laws § 203 comment b.  At the same time, it recognizes that the purposes of usury laws "to protect a person against the oppressive use of superior bargaining power" would otherwise "be deprived of efficacy if the parties could effectively choose to be governed as to usury by the local law of a state which has no substantial relationship to the contract."  *Id.* at comment e.  Thus, under New York law, while courts have suggested that a parties' principal place of business being in the selected forum may create the requisite reasonable relationship, a broad statement that a company's "headquarters" are located in a state

---

[9] That usury as a contract defense is treated as contractual for the purposes of choice-of-law analysis, *see, e.g.*, *Power Up Lending Grp.*, 2019 WL 1322621, at *3–5; *EMA Fin., LLC*, 444 F. Supp. 3d at 539–43, further suggests that affirmative usury claims should also be treated as such. In response to a breach of contract claim, the defendant who has agreed to the laws of a state that has a reasonable relationship to the transaction and that permits a high interest rate to be charged (albeit one that is not against public policy) cannot argue that it should be relieved of its contractual duties because another state has a more significant relationship with the transaction and the agreed-upon interest rate is usurious under the law of that second state.  That is, having agreed to the application of the law of State 1, a party cannot later avoid its obligations and argue in response to a suit that the law of State 2 should be applied and that the agreed rate is unlawful and unenforceable.  It would follow as a necessary corollary that when a party is seeking to not to defend against a failure to pay but to affirmatively have an obligation declared to be unenforceable, the choice of law provision also should apply.  A different rule would induce a race to the courthouse and make the law applicable to a contract turn not upon the expressed understandings of the parties or even the interests of the potential states involved but on the fortuity of which party—the person seeking to enforce the interest rate provision or the person seeking to avoid it—filed its claim first.

is not sufficient to meet the reasonable relationship requirement. *See Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel,* 346 F.3d 360, 366 (2d Cir. 2003) (vacating and remanding for further findings on choice-of-law question where record "merely reveal[ed]" that the company's "'headquarters' are in New York[] [w]ithout any further explanation of the extent of [the company's] presence in New York"); *see also Power Up Lending Grp.*, 2019 WL 1322621, *4 (citing *Finucane v. Interior Const. Corp.*, 695 N.Y.S.2d 322, 325 (1st Dep't 1999)) (explaining that the "reasonable relationship" test may be satisfied so long as "one of the parties' principal place of business is in the selected forum"); *see also TransAtlantic Lines LLC v. Amergent Techs, LLC*, 2017 WL 78511, at *4 n.6 (S.D.N.Y. Jan. 6, 2017) (same); *Zerman*, 735 F.2d at 20 ("The present transaction had a reasonable relationship to New York, where Hutton had its headquarters and where the margin loan was payable."); *cf. Clever Ideas*, 2007 WL 3234747 (concluding that choice-of-law provision selecting Illinois law would not be given effect where, although the lender was an Illinois corporation, agreements were signed in New York, borrower was a New York corporation, the guarantor was a New York resident, and the action was initiated in New York). And a court may consider whether a party is seeking to evade usury laws by "nominally operating" in another jurisdiction. *See Power Up Lending Grp.*, 2019 WL 1322621, at *4 (citing *Culbert v. Rols Cap. Co.*, 585 N.Y.S.2d 67, 67 (2d Dep't 1992)).

The foregoing analysis is dispositive of Fleetwood's motion for summary judgment on its Texas usury claim and the associated claim for attorneys' fees. The undisputed facts do not establish, as a matter of law, that Texas law applies. That is, Fleetwood has not pointed to undisputed evidence that there is no reasonable relationship between New York or the parties, nor has it argued that applying New York usury law would be offensive to the public policy of New York. *Cf.* Dkt. No. 77 ¶ 2 (noting that Richmond is a New York limited liability company;

*id.* ¶ 74 (quoting a Richmond representative as stating "[w]e are from New York"); *id.* ¶ 22 (explaining that the relevant funds were wired from Richmond's Empire State Bank account).

In light of the Second Circuit's treatment of usury claims as contractual and the weight of in-Circuit and New York cases applying contractual choice-of-law principles to usury claims, the Court cannot say as a matter of law that the choice-of-law provision in the Fleetwood Agreement is inapplicable to Fleetwood's usury claim and that Texas law should apply. Fleetwood is therefore not entitled to summary judgment on its Texas usury claims.

## III.   RICO Claim

Fleetwood moves for summary judgment on its RICO claim, which it brings against Giardina. Section 1962(c) of RICO makes it unlawful for a person "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity *or* collection of unlawful debt." 18 U.S.C. § 1962(c) (emphasis added). RICO defines "unlawful debt" to mean:

> a debt (A) incurred or contracted in gambling activity which was in violation of the law . . . or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6).

Moreover, "[u]nlike a 'pattern of racketeering activity' which requires proof of two or more predicate acts, to satisfy RICO's 'collection of unlawful debt' definition the [plaintiff] need only demonstrate a single collection." *United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991); *see also United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020) ("RICO offenses may be predicated on a single instance of collection of unlawful debt, as well as on a pattern of

racketeering activity.").  At the same time, however, the statute does not reach the collection of a loan that is made occasionally and not as part of the "business of lending money" at a usurious rate.  *See Malvar Egerique v. Chowaiki*, 2020 WL 1974228, at *19 (S.D.N.Y. Apr. 24, 2020), *vacated in part for other reasons sub nom. Weiss v. David Benrimon Fine Art LLC*, 2021 WL 6128437 (2d Cir. Dec. 28, 2021).  That is, "[t]he first part of § 1961(6) requires that 'unlawful debt' either (1) be incurred or contracted in some form of illegal gambling activity or (2) be unenforceable by virtue of state or federal usury laws. The second part—subsection (B)—further narrows the definition, requiring, *inter alia*, that the 'unlawful debt' be incurred in connection with an illegal 'business.'"  *United States v. Persico*, 2011 WL 2433728, at *2 (E.D.N.Y. June 14, 2011); *see also Wade Park Land Holdings, LLC v. Kalikow*, 2022 WL 657664, at *23 (S.D.N.Y. Mar. 4, 2022).

"The inclusion of 'collection of unlawful debt' as a major predicate for RICO liability [was] an explicit recognition of the evils of loan sharking . . . ." *Durante Bros. & Sons v. Flushing Nat'l Bank*, 755 F.2d 239, 250 (2d Cir. 1985).  To that end, the statute requires "that the loan have been incurred in connection with 'the business of' making usurious loans" and excludes from the definition of unlawful debt the "occasional usurious transactions by one not in the business of loan sharking."  *Id.* at 250.

A civil RICO claim under Section 1962(c) requires a showing that, among other things, there was a RICO enterprise whose activities affected interstate commerce; that an individual participated in the conduct of the affairs of the enterprise through the collection of an unlawful debt; and that as a result of the enterprise collecting an unlawful debt, a party—here Fleetwood—was injured in its business or property.  *Durante Bros.*, 755 F.2d at 248.  "[T]o prove that what was collected was an unlawful debt within the meaning of RICO, [a plaintiff]

would have to show that [1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with 'the business of lending money . . . at a [usurious] rate,' and [3] the usurious rate was at least twice the enforceable rate. *Id.*; *see also Dae Hyuk Kwon v. Santander Consumer USA*, 742 F. App'x 537, 539 (2d Cir. 2018) (summary order).

Defendants argue that Plaintiff is not entitled to summary judgment on it its RICO claim for two reasons: First, there is no evidence that Richmond or Giardina are liable for wrongdoing because the Agreement is not a loan, Dkt. No. 80 at ECF pp. 8–10—an argument that the Court has already rejected; and second, Plaintiff has not demonstrated "actual damages" because Plaintiff settled with Ram LLC for an undisclosed amount and because Pamela Fleetwood "could not quantify her damages when asked under oath," *id.* at ECF p. 13.

The undisputed evidence entitles Plaintiff to summary judgment against Giardina on Plaintiff's RICO claim. The undisputed evidence establishes that Richmond constitutes an enterprise, defined by RICO to include "any individual, partnership, corporation, association, or other legal entity," 18 U.S.C. § 1961(4), and that the enterprise affected interstate commerce. As set forth in Plaintiff's Rule 56.1 Statement, Richmond is a limited liability company that, for over three years, "advanced funds to small businesses in Texas and throughout the United States." Dkt. No. 79 ¶¶ 2, 4. It is also undisputed that Giardina—the founder and sole managing member of Richmond, *id.* ¶ 3—was an individual who participated in the conduct of Richmond, as he "oversaw the operations of Richmond and had final veto power over every decision made by Richmond" during the relevant times, *id.* ¶ 8.

There also is no material dispute of fact that Giardina—a natural person legally distinct from Richmond, *see Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161–63 (2001)—

participated in this enterprise through the collection of an unlawful debt; not only has Plaintiff offered evidence that the agreements entered into by Richmond and merchants across the country were identical, in sum and substance, to the Agreement that the Court has concluded is a loan, including with respect to the effective interest rates, *see, e.g.*, Dkt. No. 78-7, and Defendants do not proffer evidence to dispute this, but the undisputed evidence shows that Giardina and Richmond collected an unlawful debt, within the meaning of RICO, from Plaintiff itself.

Plaintiff contends that the Fleetwood Agreement is unenforceable under the usury laws of either Texas or New York law.  "Under Texas law, a 'usury' claim has three elements: '(1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by loan for use of the money by the borrower.'"  *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 735 F. Supp. 2d 679, 696 (S.D. Tex. 2010) (quoting *Tony's Tortilla Factory, Inc.*, 877 S.W.2d at 287).  The maximum permissible interest rate under Texas law for commercial loans is 28% per year.  Tex. Fin. Code § 303.009(c).  If more than twice that amount is charged and received, the creditor is liable to the obligor for the principal, interest, and all other amounts charged and received.  *Id.* § 305.004; *cf. Miller v. First State Bank*, 551 S.W.2d 89, 95–96 (Tex. Civ. Ct. App. 1977) ("A usurious contract is unenforceable as to the interest contracted for, charged or received."); *Danzinger v. San Jacinto Sav. Ass'n*, 732 S.W.2d 300, 304 (Tex. 1987).  Under New York law, a loan is criminally usurious if it has an annual interest rate exceeding 25%, N.Y. Pen. L. § 190.40, and such a usurious loan is void and unenforceable, *see Adar Bays, LLC*, 179 N.E.3d at 616.  Plaintiff has submitted an expert report that calculates the annual interest rate of 99.8%, *see* Dkt. No. 79 ¶ 47, and Defendants do not challenge this figure.  Nor do Defendants contest that, if the Agreement is considered a loan, the interest rate would be usurious under New York or Texas law and the debt would be unenforceable at least in

part, instead stating that "Plaintiff has not determined [sic] that the debt owed . . . was in fact

illegal" and supporting this contention with arguments that the Agreement is a factoring

agreement and not a usurious loan.  *See* Dkt. No. 80 at ECF p. 12 n.10.  Plaintiff has thus

demonstrated that the first and third prongs of the "unlawful debt" test are met: the debt incurred

pursuant to the Agreement is unenforceable at least in part under either Texas or New York laws

relating to usury, and the interest rate on the debt was at least twice the enforceable rate under

either state's statutes (28% for Texas and 25% for New York).

The second prong of the "unlawful debt" test asks if the debt was incurred in connection

with the business of lending money at a usurious rate.  Richmond was engaged in the business of

lending money at usurious rates over the course of years by advancing funds to small businesses

across the country and entering into agreements with these businesses that contained identical

language to the Agreement the Court has concluded was a usurious loan.  That was Richmond's

principal business.  Richmond has admitted that it has no evidence to refute the allegations of the

Amended Complaint—and that are reflected in the agreements and affidavits submitted in

connection with summary judgment—that it entered into usurious agreements with numerous

merchants and enforced those agreements forcefully over time.  *See* Dkt. No. 78-32 at 77, 82,

86–87; Dkt. No. 28 ¶¶ 8, 10–11, 33, 92–97 (setting forth allegations regarding those

agreements); Dkt. No. 79 ¶¶ 2–7; Dkt. Nos. 78-5 (agreement between Galaxy United Services,

LLC and Richmond); 78-6 (agreement between Eagle Painting Company and Richmond); 78-7

(agreement between Richmond and Triad Well Service, LLC); 78-23 (affidavit of president of

JMA Chocolates, a customer of Richmond, describing merchant agreement); 78-24 (affidavit of

former owner of J.B. Plumbing & Heating of Virginia, a customer of Richmond, describing

merchant agreement).  Nor has Giardina offered any evidence in response to Plaintiff's evidence that would create a genuine issue of material fact.

The undisputed evidence also shows that Fleetwood's debt was incurred in connection with this business.  While Defendants make much of the fact that the Fleetwood Agreement was written on the paper of Ram LLC and identified Ram LLC as the contractual counterparty, *see* Dkt. No. 80-4 ¶¶ 2, 17, 18, it is undisputed that the funds paid pursuant to the Fleetwood Agreement were wired from the account of Richmond "d/b/a Ram Capital Funding," Dkt. No. 79 ¶¶ 35–37, 39, 40.  It is also undisputed that the daily withdrawals were processed by "Actum on behalf of Richmond d/b/a Ram Capital."  Dkt. No. 79 ¶¶ 41–43.  When Plaintiff sought a pause in its payments so that it would not default on its obligations under the Agreement, it wrote to Richmond at its d/b/a/ Ram Capital email address and corresponded with Michelle Gregg, who was a collection agent of Richmond.  *Id.* ¶¶ 27–28.  Thus, even though the Agreement was nominally with Ram LLC, the Fleetwood's debt was incurred in connection with the business of Richmond, who advanced the funds, withdrew the funds, and handled repayment requests.  *Cf. Recticel Foam Corp. v. Bay Indus.*, 128 F. App'x 798, 799 (2d Cir. 2005) (summary order) ("New York law provides that if a party objectively manifests an intent to be bound by a contract, that intent controls, even if the party does not sign the written agreement.").

Defendants argue that Plaintiff still has not made out a claim for RICO because it has not shown that it was damaged by a RICO violation associated with the Fleetwood Agreement. "Victims of racketeering who have been deprived of their monetary resources as a direct result of racketeers' predicate acts should, under the most natural interpretation of the phrase 'business or property,' recover their pecuniary losses."  *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 229 (E.D.N.Y. 1999).  And RICO damages should be "sufficient to

place the plaintiff in the same financial position [it] would have occupied absent the illegal

conduct." *Bankers Trust Co v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988).  As Plaintiff points

out, "[t]here is no dispute that $119,617 was collected from Fleetwood's account by Richmond."

Dkt. No. 81 at 21–22.  Richmond points to evidence that Plaintiff entered into a settlement

agreement in connection with this case for an undisclosed sum, Dkt. No. 80-4 ¶ 12, and that, in

response to the question "what is your economic damage relating to this [agreement]," Pamela

Fleetwood responded "I can't answer that", *id.* ¶ 29, but Defendant does not proffer any evidence

that would suggest that Plaintiff recovered the full amount of damages pursuant to this agreement

or that Pamela Fleetwood's personal inability to quantify her damages means Fleetwood did not

suffer any or would preclude Fleetwood from offering evidence of those damages.  Nor have

Defendants suggested that the settlement agreement placed Fleetwood in the same position they

would have been in without the illegal conduct.  Defendants instead argue that "upon

information and belief," the settlement amount was somewhere around $40,000; even if that

were so, it would fall well below the actual damages suffered by Plaintiff not to mention those

damages when trebled.  Dkt. No. 80–4; *cf. Comm. Union Assur. Co. v. Milken*, 17 F.3d 608, 612

(2d Cir. 1994) (noting that "[i]f a portion or all of their investment in the partnership was

unrecoverable, a treble damage award might be appropriate, assuming the other RICO

requirements were satisfied" but concluding no viable RICO cause of action may be maintained

where defendants placed plaintiffs in the same position in the same position they would have

been absent illegal conduct by returning their initial investment and a double-digit return on their

capital).  Indeed, where treble damages are available—as in RICO cases—courts "routinely

treble damages before setoff in cases where a plaintiff sues multiple defendants . . ., settles with

one or more of them, and then prevails against the remaining defendants." *Creel v. Dr. Says,*

*LLC*, 2022 WL 987815, at *4 (E.D. Tex. Mar. 31, 2022) (trebling RICO damages before crediting settlement amount) (citing *Hydrolevel Corp. v. Am. Soc'y of Mech. Eng'rs, Inc.*, 635 F.2d 118, 130 (2d Cir. 1980), *aff'd*, 456 U.S. 556 (1982) and *New York v. Hendrickson Brothers, Inc.*, 840 F.2d 1065, 1086–87 (2d Cir.), *cert. denied*, 488 U.S. 848 (1988)); *see also N.Y.C. Dist. Council of Carpenters Pension Fund v. Forde*, 2018 WL 2455437, at *20–21 (S.D.N.Y. June 1, 2018) (following *Hydrolevel Corp.* because "the Clayton Act is the model for RICO's private right of action" and deducting compensation for RICO injuries "only after the trebling of damages").

Absent Defendant proffering any evidence to dispute that Plaintiff suffered damages, and because Plaintiff was deprived of its monetary resources as a result of Richmond's usurious lending practices, Plaintiff has shown that it was damaged. Because Plaintiff has demonstrated that all elements of its RICO claim have been met, it is entitled to summary judgment on liability on this count.

## IV. Fleetwood's Alternative Claims

Fleetwood argues that, "[i]n the event that this Court does not conclude that the Fleetwood Agreement is a usurious and unenforceable loan agreement, Fleetwood is entitled to summary judgment on its breach of contract/duty of good faith claim." Dkt. No. 76 at 42. The Court has concluded that Fleetwood is not entitled to summary judgment on its usury claim under Texas law and that further factual presentations or trial are required before the Court can determine whether New York law or Texas law applies to that claim. Accordingly, since that claim is still open, Fleetwood's argument in the alternative for summary judgment on its breach of contract and duty of good faith claims is premature and is denied.

## CONCLUSION

The motion for summary judgment GRANTED IN PART and DENIED IN PART.

Plaintiff's motion for summary judgment is GRANTED against Giardina on count five.  The

motion is otherwise DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 74.


SO ORDERED.


Dated: June 6, 2022
       New York, New York                             _____
                                                           LEWIS J. LIMAN
                                                      United States District Judge